MARLIN J. WRAGG, Petitioner, v. J. W. GRIFFIN, Sheriff, et al., Respondents.

HEALTH: Compulsory Detention and Examination of Persons. In the absence of a clear and definite statute so authorizing, state and local boards of health may not, *on mere* suspicion that a person is afflicted with, or has been exposed to, a venereal disease, cause such person to be compulsorily detained and physically examined by withdrawing blood from the veins and pus

smear from the urethra, for the purpose of determining the existence of such disease in such person, even though such examination, while painful, is not dangerous to life.

*Original Proceedings in Habeas Corpus.—Writ sustained.*

JANUARY 20, 1919.

*Dunshee, Haines & Brody,* for petitioner.

*H. M. Havner,* Attorney General, and *Geo. F. Henry,* Acting County Attorney, for respondents.

WEAVER, J.—The petitioner alleges that he is illegally restrained of his liberty by the respondent, sheriff of Polk County, Iowa, and the custodian of the county jail; that such restraint has been so imposed pursuant to an order made by the mayor of the city of Des Moines, who is ex-officio chairman of the local board of health, and by Dr. Witte, acting as health officer of the United States, directing that petitioner be arrested and compelled to submit to compulsory physical examination, in which examination blood shall be extracted from the veins of the petitioner for submission to the state bacteriologist, to determine whether petitioner is suffering from venereal disease; that no copy of such order has been served upon or furnished petitioner, but he alleges that the action was taken against him upon representations made against him by certain police and health officers. It is further said that such order is void and illegal, and in violation of the constitutional right of the citizen to be protected against unreasonable searches and seizures; and that, unless a writ of habeas corpus issue, he will be forcibly subjected to physical examination and violation of his person, and be further restrained of his liberty by confinement in the county jail or detention hospital.

Upon this petition, a writ of habeas corpus was issued and served upon the respondents, and, pending the hear-

ing thereon, the petitioner was, by order of this court, set at large upon bail.

The respondents, having appeared to this proceeding, make return to the writ, setting up as their sole and sufficient authority for the restraint of the petitioner a certain warrant, or order, in the following words:

"Order of Restraint.

"In the matter of the restraint of M. J. Wragg by the Board of Health of the State of Iowa and Local Board of Health of the City of Des Moines.

"To the Peace Officer of the State of Iowa in Charge of the City Hospital of Des Moines:

"You are hereby ordered to hold in restraint M. J. Wragg and so hold him until the further order of said board and this you will in no wise omit under penalty of the law.

"Des Moines, Iowa, October 22, 1918.

"Board of Health, City of Des Moines,

"By Tom Fairweather, Health Officer."

The matter coming on for hearing before the court, it was submitted for decision upon a stipulated statement of facts and written arguments of counsel. So far as at present material, the following are the agreed facts:

On September 27, 1918, the petitioner was arrested, upon an information filed in the municipal court of Des Moines, charging him and one Isabel Newman with the crime of lewdness. On September 30, 1918, the defendant, being arraigned upon said charge, entered a plea of "Not Guilty;" whereupon, the court made an order fixing his bail bond at $1,000, but further ordering that he be held subject to the order of the board of health. On the same day, the petitioner presented and filed a good and sufficient bail bond, as provided in the court's order. On October 4, 1918, the grand jury of Polk County returned an indictment, charging the petitioner and Stella Newman with lewd and vicious

cohabitation. The court's order, above mentioned, admitting petitioner to bail, subject to the order of the board of health, having been certified to the local board of health, said board thereupon made the order set out in respondents' return to the writ of habeas corpus as their authority for the petitioner's restraint. At the date of said order, there was no room at the city detention hospital, and the sheriff, therefore, confined petitioner in the county jail.

It is further stipulated that, if he had not been released under the order of this court, pending the habeas corpus proceedings, the petitioner would have been, and if he is remanded to the custody of respondents he will be, compelled to permit an expert to extract approximately five cubic centimeters of blood from petitioner's veins, for the purpose of having the same tested at the state laboratory in Iowa City, to determine whether or not he is afflicted with syphilis, such test being what is known as "Wasserman's reaction," —a method the correctness of which is recognized by the medical profession generally,—and also to permit the expert to take pus smears from his urethra, to be subjected to microscopical examination, for the purpose of ascertaining whether the petitioner is afflicted with gonorrhea. It is also further agreed that respondents, acting under said order from the board of health, assert the authority to continue the restraint of the petitioner for treatment, in the event that the state bacteriologist, upon completing such examinations and tests, shall report positive reaction; that the extraction of blood for such test does not involve substantial danger to life, but is somewhat painful; and the treatment does not involve such danger, but induces a considerable reaction, causing fever and nausea. It is further agreed that the matron of the city hospital would, if present, testify that, at and prior to their arrest, the petitioner and Miss Newman were registered at a hotel in Des Moines as husband and wife; that, upon the making of this arrest,

Miss Newman was taken to the hospital, where an examination developed the fact that she was afflicted with gonorrhea, and she was detained for treatment until October 21, 1918. Attached to and made part of the stipulation is a printed copy of the rules of the board of health of the city of Des Moines; also copy of a publication entitled "Venereal Diseases. Iowa State Board of Health. Bulletin No. 7." So much of the exhibits named as appear to be material upon the matter in hearing will be hereinafter set out more particularly.

The question presented by the record and the arguments of counsel may, in its final analysis, be stated as follows: May the local board of health of the city of Des Moines, upon a suspicion that the petitioner is afflicted with a venereal disease, or has been exposed to such contagion, lawfully order him under arrest, and subject him by force to an examination of his person, and compel him against his will to permit a quantity of blood to be extracted from his veins, and then be held in continued durance until the blood has been sent to an expert in a distant city, and by test thereof it is determined whether such petitioner is or is not in fact so diseased?

It may be said at the outset that the objection raised by this petitioner does not necessarily challenge the validity of any statute or any rule of the board of health by which authority is given to quarantine persons who are afflicted with contagious disease, or to remove or segregate a person so diseased from his own home for detention in a separate house or detention hospital, and there detain him until he has so far recovered his health as to be no longer a menace to the health of the community. All such measures may, for the purposes of this case, be sustained, as a wise and valid exercise of the police power for the general good. But, admitting such to be the case, does it follow that a person not known to be so diseased, and (so far as here appears)

showing no visible evidence, sign, or symptom of such disease, may be subjected to arrest, imprisonment, and violation of his person, for no better reason than that he is *"suspected,"* by someone whose identity is not revealed, to be diseased, and to satisfy the board of health or some of its officers whether there is, in fact, any ground for such suspicion? If such extraordinary and drastic authority exists, it must be found in the statute, or in some valid rule or rules lawfully prescribed by the board of health. *State v. Kirby,* 120 Iowa 26. This may be taken for granted.

Is such authority shown or pointed out by the respondents? We have examined with some care the various statutory provisions and board rules to which counsel have called our attention, and are forced to the conclusion that the power is nowhere provided, either expressly or by necessary implication. The statute providing for a state board of health provides that it shall have charge and supervision over the interests of the health and life of the citizens of the state, including quarantine, and may make such rules and regulations and sanitary investigations as may be found necessary for the preservation and improvement of public health, and provide rules for enforcement by local boards. Code Section 2565. Local boards may make sanitary rules and regulations, and establish quarantine against all contagious and infectious diseases. Code Section 2568. Syphilis and gonorrhea are quarantinable diseases. Section 2575-a6a, Code Supplement, 1913. Peace officers and police officers are required to enforce rules of the board of health. Section 2572, Code Supplement, 1913. When any person shall be sick or infected with any contagious disease, the local board may take such action as is best calculated to protect the public therefrom, and may remove the person so afflicted to a separate house or detention hospital. Section 2571-a *et seq.,* Code Supplement, 1913.

It will be observed that these statutes are framed in

general terms, within the proper scope of which boards of health prescribe specific rules and regulations; and, as we have already noted, while in terms authorizing boards of health and health officers to deal with quarantinable diseases, there is no express provision for interfering with the liberty of persons who are merely "suspected" of being diseased.

If the power is not found in the statute, is it discoverable in the rules of the board? The rules exhibited in the stipulation of facts include much matter irrelevant to the present discussion, and the paragraphs which have some bearing, near or remote, upon the issue may be culled as follows:

The state board is found to have framed and approved a series of rules which local boards were directed to adopt, record, and publish. The local board of the city of Des Moines did adopt rules as follows:

"(1) Every physician, nurse, attendant, hospital superintendent, druggist, member of police department, police magistrate, or other person having knowledge of a known *or suspected* case of syphilis or gonorrhea must immediately report to the mayor" in writing, with certain specific details of information.

"(2) It shall be the duty of the chief of police to cause all persons arrested for being found in a disorderly house, all prostitutes, *and all other persons* held under arrest *who are suspected* of having syphilis or gonorrhea *in the infectious stages* to be examined before released or discharged, and if any such persons are found to be afflicted with either of said diseases, to report the same to the mayor, as provided in Rule 1.

"(3) It shall be the duty of the mayor, upon receiving notice of the *existence of a case of venereal disease* * * * to immediately issue an order to the chief of police directing him to cause the person afflicted with such disease to be re-

moved to a separate house of detention or hospital and there restrained," until the city's health physician authorizes his release.

Among the rules of the state board, though apparently not carried into the rules of the local board, is one which provides (4) that local health officers are directed to make such examinations of persons *reasonably suspected* of having syphilis or gonorrhea as may be necessary for carrying out the board's health regulations, "and to detain such persons for such length of time as may be necessary in order to determine whether such persons are so affected." In still another clause (3), it is made the duty of the mayor, when-ever a person is suspected of having such disease in the in-fectious stages, or is suspected of having been exposed to such disease, to direct the police or peace officer to cause such person to be investigated, and in case such person is so afflicted, to cause him to be restrained at home, or, if necessary, in a separate house or hospital.

It seems quite clear that Rule 2 of the local board and the corresponding rule of the state board are intended to define the duty of the chief of police with reference to the herd of derelicts which that officer and his aids are wont to round up in their occasional raids on disorderly resorts, and to make it his duty, if he discovers or finds reason to believe that any person so coming into his custody has either syphilis or gonorrhea in the infectious stage, to report it at once to the mayor. It does not appear that this peti-tioner was ever in the custody of the chief of police, or was by such officer reported to the mayor as a diseased per-son. Rule 3 of the local board is apparently designed to define the duty of the mayor in giving effect to that part of the statute above quoted (Code Supplement, 1913, Section 2571-a *et seq.*) which provides that, when necessary, the dis-eased person may be removed from his home to a separate house or detention hospital. Reference to the statute shows

it is made applicable only "when any person shall be sick or infected with any contagious or infectious disease," and neither by word nor inference does it justify such detention or segregation of one who is merely *suspected* of disease.

The language which may most plausibly be relied upon in support of the respondents' position is that to which we have referred as appearing in the rules of the state board of health alone. These rules were prepared May 28, 1918, with a provision or direction to local boards to adopt and make publication of the same. The rules of the local board attached to the stipulation appear to have been adopted and published in January, 1918, before the action of the state board, and the record is without mention of any adoption or publication by the local board of the later rules of the state board. No question is raised in argument because of this omission, and we mention it as explanatory of the apparent lack of harmony which appears at some points between the two codes of rules. The respondents place special emphasis on that part of the rules of the state board to which we have already referred, where it is made the duty of the mayor to direct the chief of police to cause persons suspected of being diseased "to be investigated," and authorizing health officers in such cases "to make examinations" of suspected persons, and to detain them as long as it may be necessary, to determine whether they are so afflicted. But even here, there is an entire absence of any express authority to subject a suspected person to an examination by physical force, or by an extraction of blood from his body by violence for experimental purposes. Men and women were examined and treated by physicians for sexual diseases for generations before the so-called Wasserman test was discovered or invented, and, so far as we are informed, with reasonably reliable results. At least there is no evidence that, even in the technical phrase of physicians, the word "examination," in such cases, is understood as neces-

sarily meaning a blood test by the Wasserman method, or by any other method involving violation of the person; and, in the absence of explicit authority for the subjection of a person to such treatment upon suspicion alone, it ought not to be approved as a valid exercise of authority. This petitioner may be a bad man; but we have no right to assume such a fact for the purpose of minimizing his claim to protection of the ordinary rights of person which law and the usages of civilized life regard as sacred, until lost or forfeited by due conviction for crime. Even when charged with the gravest of crimes, he cannot be compelled to give evidence against himself, nor can the state compel him to submit to a medical or surgical examination, the result of which may tend to convict him of a public offense (*State v. Height,* 117 Iowa 650) ; and if there be any good reason why the same objection is not available in a proceeding which may subject him to ignominious restraint and public ostracism, it is at least a safe and salutary proposition to hold that, before the courts will uphold such an exercise of power, it must be authorized by a clear and definite expression of the legislative will. This we do not have; and, in our judgment, the restraint of the petitioner, not as a diseased person, whose detention in a separate house or hospital the statute authorizes, but solely as a *suspect,* and for the avowed purpose of forcing the exposure of his body to visual examination, and compelling the extraction of blood from his veins, in search of evidence of a loathsome disease which may or may not exist, is a deprivation of his liberty without due process of law, and he is entitled to be set free.

This conclusion renders it unnecessary for us to decide or consider the further question whether, under the concededly broad scope of power and discretion granted to boards of health, it is competent for them, by rule or otherwise, to provide that the mere fact that a person has been

arrested, or is charged with a sexual offense, or is suspected of having a venereal disease, is sufficient ground upon which to seize and imprison him, and forcibly subject him to physical examination and blood tests. It is enough for present purposes that such is not now the law, by statute or by rule of the board of health.

The writ of habeas corpus is sustained, and the respondents are ordered to release petitioner from restraint.

LADD, C. J., EVANS, GAYNOR, PRESTON, SALINGER, and STEVENS, JJ., concur.