[Crim. No. 2039. Third Dist. Jan. 8, 1948.]

In re DOROTHY MARTIN et al., on Habeas Corpus.

Wyatt, Green & Carr for Petitioners.

Chester E. Watson, District Attorney (Stockton), and Louttit, Marceau, Louttit & Wilson for Respondent.

PEEK, J.—The petitioners herein allege that the quarantine order of the San Joaquin Local Health District by which they are imprisoned and restrained without bail is illegal in that (1) the county health officer does not have reasonable cause to believe that either of them is infected with any of the diseases specified in sections 2554 and 2571 of the Health and Safety Code, and therefore there is no justification for their quarantine and to deny them bail; (2) the San Joaquin County jail is an improper place to be designated by the said health officer as a place of isolation, and (3) at the time of their arrest they had no connection with prostitution in any form and neither was in fact infected with any of the diseases mentioned in said sections.

By reason of the stipulation of counsel at the time this matter was argued the transcript of proceedings in the Superior Court of San Joaquin County, where a like application was made and denied, was made a part of the proceedings herein, subject however, to petitioners' objection to certain testimony of one of the health officers of said county, which testimony had been admitted over their objection in the superior court hearing.

Said transcript discloses that on the evening of September 9, 1947, a robbery was reported as having occurred at the

De Luxe Rooms located in the city of Stockton. The following morning petitioners were arrested by Officer Knight and taken to the police station for questioning. The next day a complaint was filed in the Stockton Police Court charging defendants with vagrancy and bail fixed in the sum of $500 each. However, by reason of subsequent quarantine orders of the local health officer both petitioners were refused their release on bail because of said orders, and were held by the sheriff of said county.

When called as a witness by the respondent sheriff, Officer Knight testified that for more than one year he had been a member of the vice squad, had personally made one arrest for prostitution and knew of three other arrests for the same offense having been made of persons living at the De Luxe Rooms but that none of said arrests involved these petitioners; that the latest arrest at this place was in February 1947, and since that time no arrest had been made although there were attempts to get investigators into the rooms but the doors were always locked. He also testified that said rooming house had the reputation of being a house of prostitution and that an examination of the premises at the time of the arrests disclosed various articles and paraphernalia usually found in such places but that such things were commonly found in many lodging houses in Stockton. The witness further stated that during a conversation at which he was present between petitioners and the chief of the Stockton Police Department, Kitty Andrews admitted having worked as a prostitute during the last two years and that Dorothy Martin admitted trying to run a house of prostitution but that the police were so active she did not have a chance to do any business; on another occasion she stated to the witness that she was running the De Luxe Rooms. The officer had no knowledge of any prior arrests of either of the petitioners.

The assistant health officer of the district, over the objection of counsel, as previously mentioned, was permitted to testify that since May, 1947, four cases of venereal diseases had been reported as having been contracted at the De Luxe Rooms, and three women who gave their addresses as the De Luxe Rooms had been examined for venereal disease, but with one exception all such examinations were negative. No investigation was made by said officer to ascertain if the women actually did reside there.

▮ By statute (Health and Saf. Code, §§ 2554 et seq.)

a mandatory duty is imposed upon health officers to take all measures necessary to prevent the transmission of venereal disease and in the enforcement of this legislative mandate such officers are vested with full power of quarantine.

 It would seem unnecessary to state that the delegation of such complete authority over one of the most fundamental of our constitutional rights—the right of personal liberty—must of necessity carry with it the obligation to exercise such unusual powers only when, under the facts as brought within the knowledge of the health authorities, "reasonable ground exists to support the belief" that the person so held is infected. (*In re Arata*, 52 Cal.App. 380, 385 [198 P. 814].) However, that is not to say that in order to warrant the exercise of such powers it is necessary for a health officer to first determine that one is afflicted with such disease before subjecting such person to quarantine, all that is required is that there be *probable cause to believe* the person so held has an infectious disease mentioned in said statutes. (*In re King*, 128 Cal.App. 27 [16 P.2d 694].)

In the Arata case the court in discussing what would amount to a sufficient factual showing to justify or warrant quarantine, observed that such facts might consist of a showing that the suspected person had been exposed to contagion or infectious influences or that someone had contracted the disease from him or her; that the one quarantined was one who committed acts of prostitution as shown by a conviction for that offense or was an inmate of a house of ill fame, thereby coming within that group, a majority of whom are diseased, as shown by medical statistics.

This case was followed by *In re Dayton*, 52 Cal.App. 635 [199 P. 548], wherein oral testimony and affidavits were presented from which the court concluded that the house at which petitioner was residing at the time of her arrest was a house of ill fame, and she being one of the inmates thereof, sufficient showing was made to detain her.

A later case, *In re Clemente*, 61 Cal.App. 666 [215 P. 698], cited with approval the Dayton and Arata cases. There the court held that testimony that petitioner therein was conducting a house of ill fame in which she was also an inmate and personally participated in the unlawful acts carried on therein, furnished reasonable ground for the health officers to enforce quarantine measures against her.

We do not understand the two cases cited by petitioners

(*In re Arata, supra,* and *In re Shepard,* 51 Cal.App. 49 [195 P. 1077]) as modifying or changing in any way the rule as stated. It is true that in each instance the petitioner therein was discharged. However, in the Arata case it was because the facts relied upon as sufficient to warrant the order appeared only by way of "narration" in the respondent's return and which statement the court stated could not be taken as "proof of the charge made against petitioner." In the Shepard case it was held that the facts shown were insufficient either to establish knowledge that the petitioner was infected or reason to believe so. Both cases reiterate the much repeated rule that whether or not a quarantine order is justified depends upon the facts of each individual case, and the obvious corollary thereof is that what may appear to be sufficient to one person may not appear to be sufficient to another.

The real issues in the present case, stripped of surrounding circumstances immaterial to such issues and simply stated, are whether or not there was reasonable cause for the health officer to believe that these petitioners were infected with a venereal disease in an infectious stage at the time the quarantine order was issued, and if so, whether such reasonable cause continued to exist at the time of the hearing before this court as shown by the testimony and affidavits of the health officers or was negated by the affidavits of physicians who examined them subsequent to the quarantine order and reported a partial negative finding.

Under the rules enunciated in the Arata case and cited with approval in *In re Dayton* and *In re Clemente, supra,* such belief has sufficient basis in evidence brought to the knowledge of the health officer tending to show that the premises in question was commonly regarded as a house of prostitution; that it contained the usual paraphernalia generally found in such establishments; that within the past few months cases of venereal diseases had been reported as having been contracted there; that several arrests had been made at the premises on charges of prostitution, although not of these petitioners; and further, that the petitioners themselves admitted having been engaged either in prostitution or in operating a house of prostitution, thus placing themselves within that class of persons more likely to be infected than not.

The necessary proof in cases such as this is analogous

to that required on a preliminary examination before a magistrate prior to commitment on a criminal charge, the extent of the inquiry being merely as to the existence of reasonable cause pending opportunity for further investigation or examination.

Petitioners further contend that the above mentioned affidavits of the physicians who examined them indicate that the reasonable cause essential to warrant quarantine no longer exists. In support thereof they cite a portion of the opinion in the case of *In re Johnson,* 40 Cal.App. 242, 245 [180 P. 644]. ██ Obviously, if one who is so detained is not and never has been afflicted with such infection he or she would be entitled to a writ. ██ However, this cannot be said of the facts disclosed in the record in the present case. From the testimony of Dr. James C. Malcolm, assistant district health officer, as well as the affidavits of Drs. John J. Sippy and H. D. Chope, district health officer and assistant respectively, to the effect that in order to determine the existence or contamination of a venereal disease in an infectious stage it is necessary that the person quarantined be confined for a period of approximately eight days under circumstances such as would restrict the individual from sexual contact or medication. This, the doctors say, is necessary for the reason that a person by the use of local disinfectants or drugs can temporarily mask or inhibit the growth of the responsible organisms and thus prevent the detection of a venereal disease. The affidavits filed by petitioners are insufficient to overcome this evidence. It is not shown that they could not or did not mask the presence of such organisms, and further, with respect to Dorothy Martin there is no report on syphilis. If the testimony of the health authorities is predicated upon sound medical knowledge in light of present day drugs and treatment techniques, and we have no cause to believe otherwise, then the conclusion of the court in the King case, *supra,* that a ''person so held may be detained legally until there is sufficient showing that the probable cause no longer exists,'' applies.

The final contention made by petitioners, that the San Joaquin County jail is an improper place to be designated as a place of isolation under said quarantine order, is likewise without merit. It does not necessarily follow from the facts alleged by petitioners in relation to the conditions of the San Joaquin County jail, which facts in the main are

admitted by the sheriff in his return—its overcrowded conditions—its condemnation by a legislative investigating committee, that their confinement at said jail by reason of the quarantine order is improper. ▮ From an examination of the applicable sections of the statutes to the question of quarantine generally it would appear that the place of quarantine would be discretionary with the health officers in the absence of any special provision for such persons. "While jails, as public institutions, were established for purposes other than confinement of diseased persons, occasions of emergency or lack of other public facilities for quarantine require that jails be used as places of quarantine." (4 Ops. Atty. Gen. 146 at p. 148.) Hence, in the absence of special facilities, use of the jail in question, although admittedly unsatisfactory, is proper for such purpose under the facts shown.

▮ We therefore conclude that the quarantine order was proper under the circumstances and showing made by respondent in his return to the petition. The order fixing bail for petitioners' appearance in this court and requiring them to report to the San Joaquin Health District for examination at such times as that authority may suggest is therefore set aside, the writ discharged, and the petitioners remanded to the custody of the respondent sheriff.

Thompson, J., concurred.

ADAMS, P. J.—I dissent.

This is an original proceeding before us in which we are called upon to determine upon the evidence before us whether the further detention of petitioners in the San Joaquin County jail is justified. In the verified petition filed herein petitioners alleged that they were imprisoned in the San Joaquin County jail on an order of the San Joaquin Local Health District, and that such imprisonment was illegal in that the county health officer did not know or have reason to believe that either of them was infected with any of the diseases enumerated in sections 2554 or 2571 of the Health and Safety Code, and that there is no justification for their isolation. Also that the jail was an improper place for their isolation since said jail had been condemned, that there were 13 girls in quarters occupied by them which quarters were designed to accommodate but six, and that they were required

to sleep four in a bed; that at the time of their arrest petitioners had no connection with prostitution in any form, and that neither was infected with any of the diseases mentioned in the aforesaid code sections. Both petitioners denied that they ever made admissions which were ascribed to them by Police Officer Knight who testified at a hearing in the superior court, and they averred that they verily believed they were free from infection of any communicable disease, and that they had not for several years been exposed to such infection; that their detention in custody was not necessary to secure their submission to examination by the physicians connected with the health district, and they were willing to report to their clinic and submit to examination, and treatment if necessary, at any reasonable times.

The writ having issued and petitioners having been released on bail, on condition that they submit themselves for examination by the San Joaquin Health District authorities, the sheriff of the county made a return which merely recited that the petitioners had posted bail bonds and been released; but on the day set for hearing before this court the said sheriff made an amended return, in which he alleged that petitioner Martin had been detained in the San Joaquin County jail pursuant to an order signed by Dr. Chope, assistant district health officer, on September 11, a copy of said order being attached to the return; and that petitioner Andrews had been detained on an order signed by Dr. Malcolm, also an assistant health officer, a copy of which order was likewise attached as an exhibit. The return also recited the hearing on the writ in the superior court, and attached thereto a transcript of the proceedings therein.

Answering the allegations of the petition herein, he denied the allegations that petitioners had been restrained because of a charge of vagrancy filed against them, asserting they were restrained because of the orders aforesaid. He denied the allegations that the health officers did not know or have reason to believe that the petitioners were infected, the reasons for such denial being the orders attached as exhibits. He denied that the county jail was an improper place of detention, but admitted it had been condemned by a legislative investigating committee, that it was in "a greatly crowded condition," that petitioners were confined with prisoners charged with crime, and that prisoners were required to sleep two in a bunk bed, which bunk beds were set in tiers. On information

and belief he denied the allegation of the petition that at the time of their arrest petitioners had no connection with prostitution and that neither was infected.

The sheriff also presented to this court a motion to set aside the order of this court admitting petitioners to bail, alleging, in support of said motion, that petitioners had been held by orders made by health officers which orders were issued pursuant to facts brought within the knowledge of said officers, which furnished reasonable grounds to support the belief that petitioners were, and still were infected with "a venereal disease in an infectious stage." Attached to said amended return were copies of affidavits made by Drs. Sippy and Chope, which will be hereafter considered.

At the hearing before us it was stipulated by counsel for petitioners that the transcript of the proceedings before the superior court might be considered as evidence by this court, subject, however, to the objections interposed before that court as to admissibility of some of the evidence there presented by respondent upon which this court should make independent rulings. Counsel for respondent conceded that the burden was on the health authorities to show reasonable cause for the detention of petitioners.

In view of that concession and subject to our rulings as to admissibility of evidence, we turn to the transcript of the testimony before the trial court.

It shows that defendants had been apprehended on September 11th, charged with vagrancy, and upon the fixing of bail by the justice of the peace, the defendants were held by virtue of quarantine orders. The respondent called as a witness Police Officer Knight who testified that he had been a Stockton police officer for 20 years, and for more than a year assigned to the "vice squad"; that petitioners were arrested at the De Luxe Rooms in Stockton; that he had made one arrest there for prostitution over a period of a year; that the general reputation of the place was that it was a house of prostitution; that he had arrested petitioners there, while they were in their beds; that on being taken to the office of the chief of police, Kitty Andrews was asked if she had ever worked as a prostitute, and she said she "tried to chippie but the police ran up and down the stairs so much she didn't have a chance to do business." On cross-examination he said that the De Luxe Rooms was situated within a block of the court house and of the Y. M. C. A.; that he had

known Dorothy Martin for more than a year, and had never arrested her, nor had he any information that she had ever been arrested; that officers had gone to the place the night before in connection with a reported robbery; that when arrested petitioners were alone in their rooms; that he was the first one that placed a quarantine order against Kitty Andrews but not against Dorothy Martin; that no others had been arrested at this place since, and no evidence of prostitution had been obtained. On redirect he stated that when petitioners were arrested they found on the premises—but not in the rooms occupied by petitioners—what were known as "trick beds," a money box on the kitchen wall, glasses with prophylactic solutions and "guns," and an enormous number of towels; but on recross-examination he said that these could be found in any rooming house in Stockton; that other than mentioned he had nothing upon which to base a quarantine order against petitioners—that all he had was a general suspicion that it might be possible that they were infected with a communicable disease.

Dr. Malcolm, assistant health officer of the San Joaquin Local Health District, was then called, and a quarantine order issued against petitioner Andrews, signed by Dr. Chope, assistant district health officer, was introduced. It recited that "based upon information received by this office the said Dorothy Martin, is suspected of being infected with a venereal disease in an infectious stage." (The words "known to be" in place of "suspected" were crossed out; and the kind of venereal disease suspected is not stated.) The order then directed that Dorothy Martin be quarantined for examination and treatment if necessary, the county jail being designated as the place for quarantine.

A similar order regarding Kitty Andrews, signed by this witness as assistant district health officer, was then introduced.

The witness was then permitted over the objection of petitioners to testify that within the past year there had been reported to him or his office from the premises in question four cases of venereal infection by men who reported that their infection was acquired at that address, but these parties were not quarantined; also that they had examined three women who gave their addresses as the De Luxe Rooms, but he made no examination to determine whether or not they resided there; that they found none of them infected, and that only one of them was quarantined; that he had never

examined these petitioners; that he found in the present situation no greater reason for quarantine than he found in the aforesaid cases; that it is his experience quarantine is necessary but that there are many instances in which venereal disease is treated without confinement; that there was nothing presented to him by the police or other person indicating recent prostitution on the part of Dorothy Martin; nor was there anything to indicate such recent participation by Kitty Andrews, except that the arrest report stated that she admitted living with Dorothy Martin in the De Luxe Rooms and admitted working as a prostitute. Under questioning by the superior court this witness said that their routine was to examine girls and women who were in the county jail after 24 to 48 hours following their arrest, and if no positive symptoms were found, to hold them for a second examination, one reason being that because of mechanical cleansing shortly before arrival at the jail, and by use of drugs, the signs of disease might be masked, and it then took from two to five days to overcome the masking.

As above stated, respondent attached to his notice of motion a copy of an affidavit by Dr. Sippy and one by Dr. Chope. They add nothing to the record before us that goes to show justification for quarantining petitioners. The one states that "reasonable grounds continue to exist to support the belief that each of said persons [petitioners] is afflicted with a venereal disease in an infectious stage"; and the other recites that "upon information received by affiant and by the office of the District Health Officer of the San Joaquin Local Health District, affiant has reasonable grounds to believe and affiant does suspect that the said Dorothy Martin and the said Kitty Andrews and both of them are infected with a venereal disease in an infectious stage." Upon what these opinions and suspicions are based is not stated. The affiants in this respect furnish no evidence to support the conclusions asserted.

As against the showing relied upon by respondent, the verified petition of these women denies that they made the admissions ascribed to them by Officer Knight. They also presented to this court certificates of two reputable doctors whose qualifications were admitted, which certificates stated, as to Dorothy Martin that she had been examined by them on September 19th and September 22d, and that smears and cultures were both negative for gonococci infection, and

Wasserman and Kline tests were negative (for syphilis). And as for Kitty Andrews, that she had been examined on September 19th, and that both smear and culture were negative for gonococci infection. There was no report as to syphilis for the latter.

On the argument before us it was conceded by respondent's counsel that the essential question is whether or not the health authorities had or have now reasonable cause to believe that petitioners were or are infected with a venereal disease in an infectious stage. He conceded that habeas corpus is a proper proceeding for the determination of this question, and also concedes that the burden is upon respondent to show that such reasonable cause existed or now exists.

In my opinion the evidence before us fails signally to meet the burden of proof imposed upon respondent to show reasonable cause to believe that petitioners are now or were at the time of their incarceration afflicted with a venereal disease in an infectious stage or at all. Giving the showing made by respondent its fullest effect, it shows no more than that one person (Officer Knight) testified that the De Luxe Rooms was reputed to be a house of prostitution. His testimony is in my opinion unworthy of credence since, admittedly, if he had that knowledge nothing had ever been done about it until a robbery was reported to have been committed there. He admitted knowing these women, and for all that appears there was just as much reason for apprehending them six months before as in September of this year. Furthermore, they were not arrested for practicing prostitution but were charged with vagrancy. The evidence that three other women who stated they lived at the De Luxe Rooms had, some months before, submitted themselves for examination by the health authorities, was pure hearsay as to these petitioners. Furthermore, the fact that those women were found not to be infected, and only one of them was quarantined, indicates that the health authorities do not find it necessary in all cases to quarantine in order to reach a conclusion as to whether a person is infected. The evidence offered that four men who *stated* that they had been subjected to infection at this place had some time before reported to the health authorities for examination, is hearsay of the rankest kind as to these petitioners, and furthermore it is conceded that the men were not quarantined.

In *In re Shepard*, 51 Cal.App. 49 [195 P. 1077], the return

to writ of habeas corpus alleged that Shepard was isolated in a hospital "suspected of being infected with . . . syphilis and gonococcus infection," and that in the opinion of respondent doctor it was necessary to isolate her until an examination was made to determine whether she was so infected; and that there was "reasonable cause" to believe that she was so infected. The evidence relied upon was that a deputy sheriff was told by three negro sailors that there were some girls to be found at the residence of Mrs. Shepard, whose house they pointed out; that two days later the deputy went to the house, asked Mrs. Shepard if she would indulge in sexual intercourse with him for a consideration, and she said she would, it being arranged that the deputy sheriff should return later for the act. She was charged with conducting a house for the purpose of prostitution, and taken to the jail, then ordered to the city hospital. The court said, page 51:

"There is certainly nothing in the record here to show that the respondent knows Mrs. Shepard to be diseased, and we cannot see that he has sufficient reason to believe that she is diseased. Paying just regard to the constitutional guaranties of the right to personal liberty and personal security, it must be asserted that more than a mere suspicion that an individual is afflicted with an isolable disease is necessary to give an officer 'reason to believe' that such person is so afflicted. The circumstances disclosed to us here are lacking in the elements necessary to establish even a well-defined suspicion that Mrs. Shepard is diseased as alleged in the return. The facts before us come within the purview of the language of the court in *Ex parte Dillon* (*In re Milstead*), 44 Cal.App. 239 [186 P. 170]."

Her discharge followed.

In *In re Arata,* 52 Cal.App. 380 [198 P. 814], Arata was charged in the police court with violation of a city ordinance making it an offense for a woman to commit an act of prostitution. She was arraigned and a date set for her trial, bail being fixed; but her release on bail was refused by the police, they asserting that the health department had ordered her held until she submitted to an examination for the purpose of determining whether she was infected with a quarantinable disease. The petition for habeas corpus alleged that she was not so infected, that she was not and never had been a prostitute, and did not commit the act charged against her. Facts stated in the return and relied upon by respondent were that

a police officer had been directed to a room occupied by Arata, that he had gone there and Arata had offered to commit an act of sexual intercourse and fixed a price which the officer paid; that thereupon she was arrested and by order of the health department placed in quarantine in the city jail, and held "to be examined by officers of the health department . . . to determine her freedom from . . . venereal disease"; that she had refused to submit to examination and had been ordered held pending determination of her freedom from such disease. It was further stated in the return that the health department had determined from experience that over 90 per cent of women apprehended for prostitution are infected, and that the rules of the health department required that the health officer of the city cause examination to be made of all such persons to determine their freedom from such disease. The court said, page 383:

"That the health authorities possess the power to place under quarantine restrictions persons whom they have reasonable cause to believe are afflicted with infectious or contagious diseases coming within the definition set forth in Political Code, section 2979a, as a general right, may not be questioned. It is equally true that in the exercise of this unusual power, which infringes upon the right of liberty of the individual, personal restraint can only be imposed where, under the facts as brought within the knowledge of the health authorities, *reasonable ground exists to support the belief* [Italics by that court] that the person is afflicted as claimed; and as to whether such order is justified will depend upon the facts of each individual case. Where a person so restrained of his or her liberty questions the power of the health authorities to impose such restraint, the burden is immediately upon the latter to justify by showing facts in support of the order. It might be proved, for instance, that the suspected person had been exposed to contagious or infectious influences; that some person had contracted such disease from him or her, as the case might be. Such proof would furnish tangible ground for the belief that the person was afflicted as claimed. *And we wish here to emphasize the proposition, which is unanswerable in law, that a mere suspicion, unsupported by facts giving rise to reasonable or probable cause, will afford no justification at all for depriving persons of their liberty and subjecting them to virtual imprisonment under a purported order of quarantine."* (Italics mine.)

It also said, page 385:

"One of the most important rights guaranteed under our constitution, that of the liberty of the citizen, is involved and cannot be lightly passed over, nor can encroachments upon that right be tolerated even under the argument that, in the main, the general result sought is a beneficent one. The law may not be set at defiance, even to subserve the best intentioned effort; much less by officers who have taken an oath to uphold it. At the hearing of this writ proof was not offered to be made that petitioner was at the time of her arrest a woman of ill fame. The narrative contained in the return, of alleged acts in which the police officer took part, cannot be taken as proof that the charge made against petitioner in the police court was true."

Petitioner was thereupon discharged.

In *In re Milstead*, 44 Cal.App. 239 [186 P. 170], on habeas corpus it was contended that petitioners' detention in quarantine pending investigation of their condition after their arrest for violation of a city ordinance was illegal. The ordinance made it unlawful to resort to any rooming-house, etc., for the purpose of having sexual intercourse with one other than a spouse. The return alleged that it was the practice to examine all persons brought to jail charged with a violation of such ordinance, or charged with any other offense involving sexual immoralities, to determine their freedom from quarantinable venereal disease, and that petitioners were being so held.

The court said, page 242, after commenting that in the event persons charged refused to submit to examination it was conjectural how long they might be kept in confinement, that sick persons who are subjected to such quarantine are not deemed to be criminals and are to be treated with every consideration and afforded conveniences reasonably procurable under the circumstances. Also, that, assuming that the arrest was legally made, and that under the laws relating to the public health inspection and quarantine by duly constituted health authorities may be made "where it is known, or appears upon reasonable ground, that the person so subjected to inspection or quarantine is afflicted with contagious or infectious diseases, such as enumerated in section 2979a of the Political Code," in order to justify detention the return of the officer should show some further reason why the

persons so detained are suspected of being afflicted with disease. It also said (p. 244) that where sufficient *reasonable cause* exists to believe that a person is afflicted with a quarantinable disease, there is no doubt of the right of the health authorities to examine into the case and, in a proper way, determine the fact. But such preliminary investigation must be made without delay, and, if quarantining is found to be justifiable, such measures may be resorted to only as are reasonably necessary to protect the public health, remembering that the persons so affected are to be treated as patients and not as criminals. The conclusion was that the health authorities did not have reasonable cause to believe petitioners to be afflicted with contagious or infectious disease warranting quarantine; and they were ordered discharged.

In *In re Dayton*, 52 Cal.App. 635 [199 P. 548], relied upon in the majority opinion, after hearing on writ of habeas corpus the court said that the order of quarantine was based upon the alleged ground that the health authorities had "reasonable and probable cause to believe that petitioner was affected with a contagious or infectious venereal disease"; that the respondent justified on the ground that petitioner was a prostitute, and that such fact afforded sufficient ground for the inference that she *might be* affected with the disease; that from the evidence the conclusion was reached that the house in which petitioner was residing was a house of ill fame and that she was one of the inmates thereof; that all of the circumstances tended to support that conclusion; that all of the surroundings, as the evidence illustrated them, the actions, conduct and demeanor of the persons occupying the place in the aggregate established to their minds quite clearly and beyond a probability merely that the house was a house of ill fame and that the inmates were prostitutes. Just what the testimony was in that case does not appear, but it was obviously much more comprehensive than that which is now before us.

In *In re Clemente*, 61 Cal.App. 666 [215 P. 698], also cited in the majority opinion, the court said that there was testimony that the reputation of the house conducted by petitioner was a house of ill fame; that she was an inmate thereof and *personally participated* in the unlawful acts carried on therein; and that the health officers, having this information, had reasonable ground to believe that petitioner was affected with venereal disease, and that was all that was

necessary to have authorized the health department to enforce quarantine measures against her.

In that case there was no showing, apparently, on petitioner's part, that she was not so afflicted; and, as stated, the evidence showed that she had participated in the unlawful acts carried on in the house.

In *In re King,* 128 Cal.App. 27 [16 P.2d 694], also cited in the majority opinion, petitioner was arrested on a morals charge, examined physically and *found to be afflicted with a venereal disease.* She disputed the finding and demanded a second examination which was denied. It was said, on petition for habeas corpus, that the law only requires probable cause to believe that a person has such disease, to justify detention in quarantine until there is sufficient showing that such probable cause no longer exists. That case is not comparable to this as petitioner had been found to be infected before she sought release on habeas corpus.

In *Ex parte Hardcastle,* 84 Tex.Cr. 463 [208 S.W. 531, 2 A.L.R. 1539], on habeas corpus, relator was held by virtue of a quarantine order. The court said that she had a right to have the existence of the disease for which she was allegedly quarantined, inquired into on habeas corpus, and that "If those facts do not exist, the officer has no jurisdiction to continue the restraint, and the court in the habeas corpus proceeding has authority to inquire whether the facts essential to jurisdiction exist." It went on to say that the decision of the health officer who ordered the arrest was not conclusive; that relator had the right to prove the nonexistence of the facts necessary to authorize her continued detention.

In *Wragg v. Griffin,* 185 Iowa 243 [170 N.W. 400, 2 A.L.R. 1327] on hearing in a habeas corpus proceeding to adjudge the power of the health authorities to hold petitioner in quarantine and extract his blood in order to make a Wasserman test where, as here, the order for his detention in the county jail was based upon what amounted to no more than a suspicion that he was afflicted with a venereal disease, the court said, at page 401 [170 N.W.] :

"It may be said at the outset that the objection raised by this petitioner does not necessarily challenge the validity of any statute or any rule of the board of health by which authority is given to quarantine persons who are afflicted with contagious disease, or to remove or segregate a person so dis-

eased from his own home for detention in a separate house or detention hospital and there detain him until he has so far recovered his health as to be no longer a menace to the health of the community. All such measures may, for the purposes of this case, be sustained as a wise and valid exercise of the police power for the general good. But, admitting such to be the case, does it follow that a person not known to be so diseased and (so far as here appears) showing no visible evidence, sign, or symptom of such disease, may be subjected to arrest, imprisonment, and violation of his person for no better reason than that he is 'suspected,' by some one whose identity is not revealed, to be diseased, and to satisfy the board of health or some of its officers whether there is in fact any ground for such suspicion? If such extraordinary and drastic authority exists, it must be found in the statute or in some valid rule or rules lawfully prescribed by the board of health.''

Also see dissenting opinion of Judge Nourse in *In re Travers,* 48 Cal.App. 764, 768-771 [192 P. 454].

As for the assertion of respondent's witness, Dr. Malcolm, as to the necessity for holding these petitioners in quarantine for at least eight days in order that the health authorities may ascertain whether or not they are afflicted with a venereal disease, it is weakened by his admissions that quarantine was not imposed on others, one of whom at least admitted being a prostitute, and that the men examined were not quarantined. Furthermore, as for his assertion that suspected persons may mask or conceal evidence of venereal disease by the methods to which he referred, I see no reason to assume that these petitioners would have any motive or desire to conceal evidence of disease. They are not detained as criminals, and under the provisions of section 1963(1) of the Code of Civil Procedure are presumed to be innocent of crime or wrong.

Important as it may be considered that those persons who have recourse to houses of prostitution may be protected from the danger of infection from venereal disease as a result of their indulgence, in my opinion it is at least equally important that these women should not be deprived of their constitutional right to freedom from detention in jail and that they should not be compelled, on pain of indefinite restraint, to submit to invasion of their rights to privacy of their persons, without more than has been shown in this case as purported justification for their further detention, particularly

in view of the evidence presented on their behalf indicating that they are not afflicted with venereal disease.

As for the protests of respondent that parties detained on quarantine orders should not be admitted to bail, it is not without precedent for a court to so release a petitioner seeking relief by way of habeas corpus. It appears in several cases, not only in this state but elsewhere, that petitioners were so released. See, for instance, *In re Johnson,* 40 Cal.App. 242 [180 P. 644]; *In re Travers, supra; Wragg* v. *Griffin, supra.*

In my opinion respondent has failed to show reasonable or probable cause to believe that these petitioners are infected with any venereal disease or that they have been exposed to contagion, or that any one has contracted such disease from them, or that they have committed acts of prostitution.

The question before us is not whether, by reliance upon the portions of the record before us there may now be found some possible justification for the detention of petitioners, but whether, upon competent evidence before us, we, as finders of fact, are satisfied that respondent has shown reasonable cause to believe (not suspect) that these petitioners are infected with a venereal disease in an infectious stage.

Even a prostitute is entitled to the protection of those fundamental principles of liberty which are the basis of our civil and political institutions; and the zeal of an officer ought never to be permitted to transcend the constitutional rights of an accused. The petitioners should be discharged.