## No. 16,615.

KALLNBACH *v*. THE PEOPLE.
(242 P. [2d] 222)

Decided February 4, 1952.　Rehearing denied March 17, 1952.

Mr. DONALD E. LA MORA, Mr. MARTIN J. MURPHY, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. NORMAN H. COMSTOCK, Assistant, for the people.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

IN an information filed in the district court, Carl Albin Kallnbach, Jr. was charged with causing the death of Beverly Jean Warren by operating an automobile while under the influence of intoxicating liquor and an exhilarating and stupefying drug (section 39, chapter 48, '35 C.S.A.). Upon trial the jury returned its verdict of guilty, and thereafter judgment was pronounced. Defendant is here with assignments of error seeking a reversal.

The record consists of more than 1500 folios, practically all of which is the testimony of various witnesses. A detailed statement of their testimony would unduly lengthen our opinion. In *St. Louis v. People*, 120 Colo. 345, 209 P. (2d) 538, we stated: "In considering the evidence we are mindful of the presumption of law obtaining here, which is that the defendant had a fair and impartial trial before a competent court and jury,

and that both discharged their respective duties under the law. The burden here is upon defendant to disclose and establish prejudicial error, if any, and it is our duty to review and apply the evidence so as to support the judgment. [citing cases]"

Guided by this presumption of law, we have read and carefully considered the entire record, and from it the essential and important facts may be summarized as follows:

Defendant is thirty-nine years of age; a salesman; had been a member of the police force in Chicago, Illinois, for approximately eleven and a half years; had driven an automobile for more than twenty-five years and had never been convicted of a crime.

On the 17th day of February, 1950, defendant was in Oakley, Kansas, on business, and was suffering with an abscessed tooth which the dentist refused to extract. However he gave defendant a prescription for some tablets similar to aspirin and two other small tablets from his own supply. The dentist did not advise the defendant what effect the taking of either tablet would have on him other than relieving the pain from the abscessed tooth.

On the following day, at about 4:30 o'clock P. M., defendant left Oakley for Colorado Springs, and enroute took some of the aspirin-like tablets, and thereafter one of the smaller ones given him by the dentist. He stopped at a cafe in Hugo and obtained a quart of coffee to overcome a drowsiness. After leaving Hugo and in the vicinity of Simla, defendant was given a "ticket" by a highway patrolman for speeding. Thereafter, traveling westward toward Colorado Springs, he passed through Simla, Ramah, and Calhan. A short distance past Calhan he found a motorist whose car was in the barrow pit by the side of the road, and assisted him in extricating it therefrom, whereupon he and the motorist returned to Calhan at about 9 o'clock P. M. and entered a pool hall. There defendant, according to his own testimony, had

either a drink of whiskey or beer. According to the testimony of others, he drank beer more or less from the time he entered the pool hall until he left at about 11 o'clock to attend a dance. Several witnesses testified that while in the pool hall, and at the dance, defendant was drunk, and was taken from the dance hall because of his conduct. After leaving the dance, two men who were with him testified that he was in no condition to drive his automobile to Colorado Springs. One of them volunteered to drive his car to that city for him, but he insisted that he do his own driving.

According to defendant, in leaving Calhan he was so confused that instead of going westerly to Colorado Springs he traveled easterly toward Simla. He became drowsy and parked his car on the shoulder of the highway and slept for about an hour or until about 1 o'clock A. M., whereupon he felt refreshed and alert.

There was competent evidence before the jury that one Tipton and his friends had been in Simla and were returning westerly therefrom to Calhan, near where Tipton and his passengers resided. At a point a short distance west of Ramah, Colorado, Tipton was driving on the northerly side of the east-west highway at a speed of forty-five to fifty miles an hour. Defendant was driving easterly on the highway, and when within about seventy-five feet of Tipton's car, drove his automobile across the center line of traffic and on Tipton's side thereof, and Tipton, in attempting to avoid a collision with defendant's automobile, veered to his left, and almost immediately the autos collided, striking on the right fenders thereof, resulting in serious injuries to Tipton and the death of Beverly Jean Warren, a passenger in Tipton's car.

Defendant and the injured persons in Tipton's car were removed to a hospital in Colorado Springs. Without objection, a sample of defendant's blood was taken by a physician and thereafter analyzed by a registered medical technologist, with the result that it was found

that the alcoholic content of his blood was "Point two eight per cent. That is twenty-eight hundredths, or twenty-eight hundred milligrams per hundred cc's." This medical technologist further testified that "anything over one point five is considered under the influence of alcohol" and "would cause an impairment of his ability to drive."

The highway patrolman who was at the scene of the accident, and others who talked with defendant after he was removed to the hospital, including the physician who attended him and took the sample of his blood, all testified that they detected the odor of an intoxicating liquor on defendant's breath either at the time of the accident or shortly thereafter.

The highway patrolman, who arrived at the scene of the accident shortly after its occurrence, testified that defendant's automobile at the time of the collision was "approximately two feet on the other side of the north line of traffic."

The errors as assigned here are:

1. The admission of the testimony of the registered medical technologist because: (a) The same was incompetent. (b) The evidence was violative of defendant's constitutional rights and privileges. 2. The evidence was insufficient to establish that defendant's driving ability had been impaired by intoxication. 3. Error in instructions. 4. Misconduct of the district attorney. 5. Error in overruling the motion for a new trial. 6. Insufficient evidence to establish defendant's negligence and wilful disregard of the rights of others. 7. The verdict is against the law and the evidence. These assignments will be considered in the order mentioned.

1. (a) The registered medical technologist was a college graduate and had had a year's special training at Toledo University, which is a school approved by the National Board of Registry; had been employed at St. Francis' Hospital in Colorado Springs for about nine months; at Camp Carson near Colorado Springs for

three and a half years; and at Memorial Hospital in Colorado Springs for a period of four and a half years; during all of which time she was engaged as a registered medical technologist, and her work involved blood and other analyses. She testified that in the analysis of defendant's blood she used the Nicloux method, which was an accepted method in blood analysis, with the result hereinbefore noted. Her evidence was competent; its weight was for the jury's determination.

■ There was testimony introduced on defendant's behalf regarding the Nicloux method of blood analysis and questioning the accuracy thereof. Aside from any blood analysis, there was competent evidence sufficient to warrant the jury in determining that defendant, at the time of the accident, was driving under the influence of intoxicating liquor. Apart from the testimony of the registered medical technologist, the jury might properly have found defendant guilty as charged. Neither we, nor the jury, are sufficiently learned in the art of blood analysis to determine whether the Nicloux method or other of the methods to which defendant's physicians testified, is the better and more accurate method, but the weight to be given such testimony of this witness, as we have said, was a matter exclusively for the jury's determination, and we perceive no error in its reception.

(b) In *Block v. People*, 125 Colo. 35, 240 P. (2d) 512, we held that evidence of the alcoholic content of one's blood, determined by specimens thereof taken from a person's body, without objection, was not in violation of his constitutional rights and privileges guaranteed by section 18, article II of the Constitution of the State of Colorado, or the Fifth Amendment to the Constitution of the United States of America.

2. By section 39, chapter 48, '35 C.S.A., Colo., it is provided: "Any person while under the influence of intoxicating liquor or of any exhilarating or stupefying drug, who causes the death of another by operating or driving any automobile, * * * in a reckless, negligent

or careless manner, or with a wanton or reckless disregard of human life or safety, shall be deemed guilty of a felony * * *."

In the instant case it was incumbent upon the People to establish beyond a reasonable doubt that defendant violated the provisions of this statute. There was competent evidence introduced on the trial from which the jury, if such evidence was believed by it, might determine beyond any reasonable doubt that at the time of the collision resulting in the death of Beverly Jean Warren defendant was violating the statute. Some of this evidence, it is true, was disputed, under which circumstances it became the particular duty, and was within the province of the jury to determine therefrom which was most worthy of credit and give credit accordingly. We have repeatedly held that where there is competent evidence to support a jury's verdict, the weight thereof and the credibility of the witnesses are questions exclusively for determination by the jury. *St. Louis v. People, supra.*

3. Error is assigned to instruction No. 7. Counsel for defendant state they objected to the giving of this instruction and tendered in lieu thereof instruction No. 3, which the trial court approved; however, instead of withdrawing instruction No. 7, to which if any objection was made the same does not appear in the record, counsel state that the court gave both their tendered instruction No. 3 and its instruction No. 7, to which, as we have said, no objection appears in the record. It is the contention of defendant's counsel that no opportunity was afforded them to object to the instructions before the same were finally prepared and given to the jury, and, in addition thereto, that instruction No. 7 is prejudicial because an inconsistency prejudicial to defendant's rights exists between said instructions Nos. 3 and 7. We recognize that counsel should be given an opportunity to object to court instructions prior to giving them to the jury, and, in the absence of a showing

otherwise, it will be presumed that this course was followed. Be that as it may, we have examined the two instructions.

Instruction No. 3, which was counsels' tendered instruction, so it is said, reads:

"Instruction No. 3

"You are instructed that the mere happening of an accident does not raise any presumption of the guilt of the defendant.

"For negligence of any type to exist you must first find that the defendant owed a duty to the deceased to act with care.

"Criminal negligence is such a failure to observe the standard of conduct of an ordinarily careful and prudent person under the conditions and circumstances, that the actors conduct partakes of a reckless disregard of life and a wilful disregard of the safety of others; such conduct is the equivalent of the intentional doing of an act with knowledge that substantial harm will result and with a wanton and reckless disregard of the probable consequences of said act."

Instruction No. 7 reads:

"Instruction No. 7

"You are instructed that the mere happening of an accident or the death of a person occasioned thereby does not raise any presumption of guilt of the defendant. And before you can find that the defendant at the time and place of the accident drove his automobile in a reckless, negligent or careless manner, or with a wanton and reckless disregard of human life and safety, you must find from the evidence beyond a reasonable doubt that at said time and place he failed to exercise that degree of care and prudence in the operation of his automobile that an ordinarily careful and prudent person would exercise under similar circumstances to prevent injury to another."

We have examined the record in *Rinehart v. People*, 105 Colo. 123, 95 P. (2d) 10, and find therefrom that de-

fendant's attorney there objected to an instruction reading: "You are instructed that negligence is the failure to observe, for the protection of the interests of another person, that degree of care, precaution and vigilance which the circumstances justly demand, whereby such other person suffers injury; in other words, negligence is the want of that care and prudence which a person of ordinary intelligence would exercise under all the circumstances of the case. Negligence is never presumed, but must be proved by the evidence, the same as any other fact."

The objection made to this instruction before the same was read to the jury was: "The defendant objects and excepts to the giving of Instruction No. 7 because it assumes that the manner of the negligence required in civil actions is sufficient in this case, which we feel is not a true statement of the law, and said instruction is prejudicial to the rights of the defendant unless given at length to show that it is necessary for the defendant to have committed criminal negligence in order to be found guilty in this case."

With reference to this instruction and the objection thereto, we said in *Rinehart v. People, supra:*

"Counsel's attempted distinction between negligence in civil cases and 'criminal negligence' is without merit. Following the customary method, we must interpret the statute by taking the natural meaning of its language. There is no ambiguity in this respect.

\* \* \*

"Instruction 7 is a correct definition of negligence, counsel's objection being that 'it assumes that the manner of the negligence required in civil actions is sufficient in this case, which we feel is not a true statement of the law, and said instruction is prejudicial to the rights of the defendant unless given at length to show that it is necessary for the defendant to have committed criminal negligence in order to be found guilty in this case.' What has been said above of a similar objection

to instruction 2 is a sufficient answer. There was no error here."

As we construe the language in *Rinehart v. People, supra,* instruction No. 3, here under consideration, was more favorable to defendant than any to which he was entitled, and instruction No. 7, in substance, was expressly approved by this court. Defendant could not have been prejudiced by instruction No. 7.

██ 4. Under this assignment defendant's counsel take the position that prejudicial error was committed by the district attorney in his closing argument to the jury, and in their brief they quote what they term to be the objectionable part of such argument. We are confined to the record in our consideration of cases on review. A careful reading of the record in the instant case discloses that the arguments of counsel were not preserved in the record nor was any attempt made by defendant's counsel to have the portion to which they now object made a part thereof. Under these circumstances we cannot consider this assignment. *Ryan v. People,* 60 Colo. 425, 153 Pac. 756; *Wolf v. People,* 117 Colo. 321, 187 P. (2d) 928.

We have considered the fifth, sixth and seventh assignments and discern no error committed by the trial court prejudicial to defendant's rights or which constitute a denial of a fair and impartial trial.

Defendant was ably represented by counsel at the trial and here, and the plight in which he now finds himself is not due to any lack of ability or research on their part.

The judgment is affirmed.

Mr. Justice Holland and Mr. Justice Moore dissent.

Mr. Justice Holland dissenting.

Adhering to the old but almost forgotten rule of giving the defendant the benefit of reasonable doubts, I find among the unusual assortment of errors presented by

this record much to create doubt. My constant concern here, and in all cases involving life and liberty, is that a fair trial obtain. I write my firm convictions not with the thought that it will be effective in this case, but that sometime, somewhere, the consideration of my observations may benefit some unfortunate soul in time of trouble. It might be me or mine, who knows.

Disaster is the usual pattern of drunken drivers, and I abhor the menace; however, it is not every instance that death occurs when a driver has partaken of some liquor, that he is unmistakably at fault and becomes a felon thereby. True, the odds are against him, but it is for the exception that we must keep a constant vigil.

It is my opinion that by the admission of questionable and improper evidence, and misdirection and nondirection, the jury was deprived of instruction for its deliberation that would have been of benefit to defendant and to which he was entitled. The quotation in the majority opinion from *St. Louis v. People,* 120 Colo. 345, 209 P. (2d) 538: "In considering the evidence we are mindful of the presumption of law obtaining here, which is that the defendant had a fair and impartial trial before a competent court and jury, and that both discharged their respective duties under the law. The burden here is upon defendant to disclose and establish prejudicial error, if any, and it is our duty to review and apply the evidence so as to support the judgment." is to me of questionable importance. We have no primary duty to support any judgment. It is our duty to review the record and determine whether or not a fair trial was had. It is not uncommon to find that a judgment is the result of the admission of improper evidence and misapplication of the law, even though arrived at by the conscientious attempt to discharge their duty by the court and jury. We must not overlook the prevailing human tendency for a desire to convict someone because of a tragic happening.

In this light, may I present a more comprehensive

statement of the record facts than is contained in the majority opinion herein.

At the beginning of the period leading up to the fatal accident, defendant had taken, on a dentist's prescription, a number of sedative tablets, together with a barbituate known as nembutal, without having been told the effects such drugs would have other than to relieve the discomfort of an ulcerated tooth. This appears from the testimony of defendant and might at first appear to be a self-serving statement or one to improve his defense; however, it is not denied or contradicted, and it does appear from the testimony of a courtesy patrolman that when defendant was taken to the hospital, the pills were found among his personal effects, also a prescription issued by Dr. Butell, a dentist in Oakley, Kansas, and there was an envelope with one small pill in it. Later, and a few hours prior to the accident, there is testimony that defendant had a few drinks of beer. With this preliminary in mind, the following facts as shown by the record, are now to be considered.

Defendant, a man in middle life, having business that required his attention in Oakley, Kansas, not far from the Colorado border, the day before the accident, called on the dentist, who refused to extract the tooth due to its condition and gave defendant the prescription for the nembutal pills hereinbefore referred to. At about four thirty o'clock P. M. on the afternoon before the accident at about one o'clock that night, defendant left Oakley to drive to his home in Colorado Springs, he testified that after pain around his tooth started, he commenced taking the sedative tablets in increasing number and finally became drowsy and at about seven forty-five o'clock P. M. took one three-quarter grain of nembutal; his drowsiness continued and he stopped at Hugo and obtained and drank a pint or more of black coffee to refresh himself; he then continued driving and his drowsiness returned; he saw another automobile in the ditch at the side of the road; he stopped and assisted

the driver to get the car out of the ditch, who then asked him if he could pay defendant, and would pay him if they would go back to town; at that they drove back about three miles to Calhan and went into a poolhall about nine o'clock P. M. Defendant had a drink and said he was under the impression it was whiskey. This is the only place in the record where the defendant's drinking of whiskey is mentioned and no explanation of where this one drink of whiskey came from or who gave it to him, and he later was not sure as to whether it was whiskey or beer; that his recollection about it was hazy; he then accompanied someone to a dance; that after leaving the dance, he went in a truck with someone else back to Calhan and got into his own car, sat there for a while and then finally backed it up and proceeded in a direction that he thought was Colorado Springs, being unfamiliar as to how the town was laid out; he then found that at times his memory was fogged and hazy and at other times lucid; that he left Calhan about twelve o'clock; that he drove over to the side of the road to sleep, believing that it would do him some good; that he awakened about ten or fifteen minutes before the accident, and that he felt refreshed and much better and that all that happened after that time until the accident was very clear in his mind. There being little traffic on the road, he tried to observe the signs from his headlights on the other side of the road from his line of traffic and at one time drove over on to the wrong side of the road to read a sign; shortly thereafter he saw the lights from an automobile approaching him; and he dimmed his lights and the driver of the other car dimmed his; he noticed the lights of the approaching car coming in his path; he veered to the left and the other car veered to his left and both tried to right themselves and met almost head-on in the middle of the road. There were several passengers in the other car, mostly teenagers who had been to two dances.

At this point we note from the record that the driver

of the other automobile admitted he had had one beer; that he was taken to the hospital and the attendants testified that there was a strong odor of alcohol about ·him and on his breath and they wondered why a blood-alcohol test was not taken of him. Beverly Jeanne Warren died shortly following the accident; all parties involved suffered numerous minor injuries, including defendant who had such injuries, consisting mostly of a lacerated leg and severe shock; and all were taken to a hospital for medical attention. While defendant was waiting outside the emergency room, Dr. Johnson, connected with the hospital, came out and told defendant he wanted to take some blood and gave no further explanation what it was for or anything about it, and the doctor testified that defendant's attitude was passive, that he followed the doctor into the emergency room where the blood specimen was obtained by the doctor first wiping off defendant's arm with alcohol and then withdrawing 5 c c.'s of blood. There seemed to be a loose or careless method used in handling this specimen until the analysis was made. The analysis arrived at by the Nicloux method, condemned by medical testimony in the record as not being used in the major laboratories, showed an alcohol content of the blood of "point two eight per cent." Pathologists testified, stating that 10 c c's of blood were required for anything like an accurate test. Dr. O'Brien testified that when the area was sterilized by alcohol for the taking of the blood, that it would easily affect the results of analyses by showing a higher alcoholic content.

All·witnesses testifying as to the manner in which defendant handled his automobile during the evening and on the road just prior to the accident, testified to the effect that he handled it in a perfectly normal way. All of the testimony concerning the question of the amount of beer defendant drank and as to whether the witnesses believed defendant to be intoxicated or not, presents an over-all picture that is not satisfactory or

conclusive. The People's witnesses, consisting of quite a number who observed defendant during the evening at the poolhall and at the dance and outside, were not positive as to defendant being intoxicated, but finally were of the impression that there was something wrong with him, and he appeared to be sick and unsteady at times, and finally concluded that he was intoxicated. Some of them saw him drink one or more, or parts of a drink of beer at different times; some testified that he seemed to be able to walk normally at times and again would be unsteady and had to hold on to something. Those who observed him at the dance said that he danced with ease, showed no signs of intoxication, and that his conversation was understandable.

On behalf of defendant, the following testimony was given: Edward Spilly, the operator of the poolhall in Calhan, testified that at about eight thirty o'clock P. M., defendant, accompanied by Alex Pavlica (the man whose car was in the ditch), came into the poolhall and that Pavlica did not buy a beer for defendant, and defendant did not buy any beer; that during the evening he served defendant one glass of beer; that he observed defendant during the evening; that the beer he was drinking was from the glass that he had served him; that he staggered around one minute and the next he walked as straight as ever, and the witness said, "I couldn't figure him out;" that he last saw defendant about eleven thirty or twelve o'clock; that at that time, in his opinion, he was not under the influence of intoxicants; that defendant complained of being sleepy.

Elbert Henry, manager of a grain elevator at Calhan, and deputy sheriff, observed defendant at the dance between ten thirty and ten forty-five o'clock P. M. and from his observation, he noticed nothing that would indicate he was drunk.

Margaret Bartell, a clinical instructor at Memorial Hospital, testified that she went to the emergency room when the accident cases were brought in that evening;

that she observed Dale Tipton, who was the driver of the car that collided with defendant; that there was a definite alcohol odor coming from him and she was unable to determine whether he was under the influence of intoxicants; and that was about three o'clock in the morning; and that she could not determine whether it was alcohol or beer that she smelled on Tipton.

Dr. Chandler testified he saw defendant; that he had lacerations on his left leg; that he did not see the treatment but dressed his leg the next day; that on the first occasion he did not notice whether defendant was intoxicated or not.

Mary Margaret Spence, a nurse and relief night supervisor at the hospital, testified that she saw Dale Tipton and that there was an odor of alcohol on his breath; that it was a rather strong odor and she formed an opinion that Tipton should have a blood alcohol test, but she had no authority to order one; that she observed defendant and detected very little odor on his breath; that she did not know who requested the alcohol test on defendant; a patrolman was present, but he did not request a test of Mr. Tipton.

Dr. R. W. Urich testified that he was a physician and pathologist at St. Francis and Glockner Hospitals and stated that the Nicloux method of blood alcohol test is not one of the best methods because it does not eliminate the source of human error in comparing colors, and that in taking these specimens, alcoholic or any other contamination immediately nullifies the test; that no clinical pathologist or chemist would accept a test made from blood taken where the area had been cleaned with alcohol and the syringe immediately inserted; he further testified that a man of 190 or 200 pounds weight would have to consume about a quart of alcohol to reach point two eight; that the standard books state that alcohol is not to be used even if allowed to dry; the skin contains small portions and the alcohol that entered these portions would not have a chance to evaporate.

Dr. E. J. O'Brien, physician and surgeon licensed to practice in Colorado, testified that if alcohol and three-quarter grain of nembutal are taken together, the patient would be confused, his mind would not be clear; he would have blackouts; his recollection would be hazy, but that there could be lucid intervals; that the effect of nembutal varies according to the individual; that in some individuals point two eight would show intoxicants but not necessarily impair the ability to drive.

A casual study of this evidence discloses that none of the witnesses testifying knew that defendant had taken a powerful drug in addition to a number of less sedative tablets. The majority of the witnesses, without this knowledge, who observed defendant during the evening, stated that they thought something was wrong with him and finally concluded that he was intoxicated. The amount of beer consumed by defendant was not definitely established, and at most, there is no evidence to show definitely that he had more than three or four glasses of beer. "The quantity of intoxicating liquor that would produce no perceptible effect upon one person may intoxicate another, depending on many circumstances." *Stevens v. People,* 97 Colo. 559, 563, 51 P. (2d) 1022.

By the foregoing it is now demonstrated that there should be a reasonable doubt as to defendant's intoxication from liquor. We do have an undisputed combination of the effects of beer and a powerful drug. It may be said that if his condition, as testified to, was aggravated by the drinking of beer, that he drank the beer voluntarily. Can that statement be made with assurance? Who can say that any person whose reason may be befogged by a powerful drug can be charged with voluntarily doing anything, whether it is drinking beer or some other act. It is undisputed that his taking the drug was not voluntary in order to produce an exhilarating effect. It was taken on the prescription of the

dentist to relieve pain and without any warning or advice as to other possible effects. An involuntary drug condition is a complete defense to the statute insofar as it relates to drugs.

There is no evidence to the effect that defendant's ability to operate an automobile was impaired. The evidence is overwhelmingly to the effect that he drove his car in a proper manner. The fact that the accident happened as it did is not of itself evidence of impaired driving ability. Similar accidents frequently happen to the most abstemious people. As to how this accident might have happened I will later demonstrate from the record. Regardless of any questionable testimony as to the intoxication of defendant, or any evidence improperly admitted as a result of the blood alcohol test, I rely upon the following quotation from *Stevens v. People, supra,* "It seems to us that a sufficient test is this: When a driver is so under the influence of intoxicating liquor that his capacity to operate the automobile is impaired, he is intoxicated within the meaning of the law." The evidence of intoxication before us does not meet this test.

The driver of the automobile which collided with defendant's car was driving forty-five or fifty miles an hour, while defendant was driving twenty or twenty-five miles an hour. The driver of the other car, Dale Tipton, had drunk some beer. Not being on trial, no searching examination was had as to the quantity he might have consumed. It was at least so evident that the nurse at the hospital wondered why a blood alcohol test was not taken of him. Whether intoxicated or not, at the speed he was driving in meeting another car on the highway, there could have been for a split second of time a careless maneuver on his part that brought on the confusion whereby in the last instant, each driver was trying to dodge the other. Any other solution of the record evidence is questionable and doubly so when the liberty of defendant is involved. The proximate cause of the

accident is obscure, and to fasten the liability on this defendant because of his peculiar actions resulting from consuming a combination of a drug and beer, under the circumstances, an hour or so before the accident, is manifestly doubtful. If so, defendant did not receive the benefit of this doubt either from the court or jury.

Error was assigned as to the instructions set out in the majority opinion. That these two instructions when read together are inconsistent, requires only a casual reading thereof. One is an instruction designed for civil actions in damages, the other is clearly an instruction on criminal negligence. If the jury followed the civil instruction—and no one can say that it did not—then defendant was prejudiced. Being inconsistent instructions, this court cannot speculate on which one the jury followed. It is certain that the state did not establish with that high degree of proof necessary, what was really the cause of the accident, and coupled with the probable confusion of the jury by these instructions, defendant unfortunately was convicted.

We turn now to the question of the admissibility of the blood alcohol test in this case. Timely objections were made to its admissibility on two apparent and substantial grounds, namely, its questionable accuracy, and further, that it would be in violation of both state and federal constitutional safeguards as the technique employed in the test here made is severely criticized by the testimony of doctors and chemists whose qualifications are not questioned. I will not further detail this criticism other than to say that, if such a test when properly made is admissible in violation of constitutional rights, then this test as made should not be allowed to become what was likely a controlling factor in this case.

First, defendant is, by our Constitution, protected against unlawful searches of his person and cannot be compelled to incriminate himself. This test falls in that class of evidence, and seemingly unreasonable distinctions are attempted to be made between this and "testi-

monial" evidence. In principle, I am unable to see the distinction when considered in connection with the constitutional safeguards. In the early case of *Tuttle v. People,* 33 Colo. 243, 79 Pac. 1035, not overruled as of this date, our court clearly and unequivocally announced the wholesome rule, "The constitutional provision was not intended to merely protect a party from being compelled to furnish a *single link in a chain of evidence* by which his conviction of a criminal offense might be secured." (Italics supplied.) It is apparent that here the blood alcohol test was an important link in the chain of evidence. This statement in the Tuttle case may be countered with the argument that in the instant case defendant was not compelled to furnish this link of evidence. In answer to that argument, I will say that all of the well-reasoned authorities agree that if the test is taken and made by force or over the objection and protest of the defendant, it is not admissible. An equally well-established line of authority is to the effect that it is admissible if taken upon the request or active intelligent consent of the defendant. This is sound reasoning because the provisions of the Constitution afford no protection that may not be waived. However, there is a vast difference between the terms "consent" and "without objection" as loosely applied in the apparent desire to insure conviction. This accounts for my refusal to concur in the case of *Block v. People,* 125 Colo. 35, 240 P. (2d) 512, announced by this court November 19, 1951, and relied upon by the author of the majority opinion herein for the admissibility of the blood alcohol test.

As the record discloses, immediately after the accident, when defendant was in a dazed condition from shock, and was waiting outside the emergency room at the hospital, a doctor connected with the hospital told him that he wanted to take some blood. The doctor testified that defendant's attitude was passive and he followed the doctor into the emergency room where the specimen was obtained. There was no explanation by the doctor as to

what the blood was for or how it might be used, and no warning of any kind to the defendant that he was submitting to a test that might be used against him in a criminal prosecution. Defendant had no option in the matter. In the apt words of *State v. Horton,* 247 Mo. 657, 153 S.W. 1051, "It requires something much more substantial than silence to justify an invasion of his constitutional right not to be compelled to furnish evidence against himself." This court has not been slow to reject confessions taken without the customary warning that the defendant is not compelled to make a statement and that the same may be used against him. In principle, there is no difference. In my opinion, which I believe to be sound, defendant here should have been warned that his blood was being taken for the purpose of making an analysis which might be used against him. The submission must be free and voluntary and not merely passive or a failure to make objections. We have consistently held that confessions must be free and voluntary and the defendant apprised of his constitutional rights.

Long before our decision in the Block case, supra, and apparently overlooked in that decision, this court in the case of *Riss & Co. v. Galloway,* 108 Colo. 93, 114 P. (2d) 550, said: "We think the rule may not be extended so far as to require him, under guise of a physical examination, to furnish samples of his bodily components to be used for the purpose of chemical analyses. * * * The matter is one of first impression in this state, so far as we are advised, and we are furnished no citation of authority from any other jurisdiction directly in point. If there are any such, *contrary to the view above expressed, we would not be disposed to follow them; * * *.*" (Emphasis supplied.) If we are careful to lay down such a rule in a civil case, it is doubly important that we not relax the rule in a criminal case. We do not have to violate one law to enforce another. A distinction can readily be made between the cases involving foot-

prints, fingerprints, tatoo marks, and other marks usually exposed. Consent cannot be predicated upon failure to protest or resist. Ignorance of the right to protest or resist may induce a defendant to be passive and in such a state of mind as not to resist the request for the blood specimen. It was not sufficient for the prosecution to show that defendant was a passive subject.

It is to be noted that the circumstances of this case present one of first impression not only in this jurisdiction, but elsewhere so far as I have been able to ascertain. The singular character of this case is the effect of the combination of drugs and beer. It cannot be questioned that the influence of the drug, so far as the meaning of the statute here involved is concerned, was involuntary. Being involuntary who can say what effect this involuntary drug condition could have had upon producing or resisting an inclination to drink the beer; further, who can finally say that if defendant's driving ability was affected, was it from the drug involuntarily taken or from the combination with an insufficient amount of beer to induce intoxication. The jury was left wholly without any guidance from the court as to the question of voluntary or involuntary condition which was so apparent, and the court's failure to instruct thereon of its own motion was prejudicial to the rights of defendant. This was the duty of the court whether so requested or not.

Turning again to the admissibility of this test, it may logically be said that the results setting a standard for intoxication are mere deductions from books and literature on the subject, and in any given case, are not infallible without corroboration by other symptoms. It cannot safely be said in this case that any other symptom was that produced by the beer instead of the drug. An additional objection to the admissibility of such a test lies in the fact that the procuring and making of the test, the handling of the blood specimen, is open to too many mistakes, fraud and unscrupulous design. Many

instances could arise wherein the eagerness for a conviction on the part of someone connected with the procuring of the test, asserts itself. Regretfully, I must say that such actions are apparent in some cases. For a long time I had believed that the tribe of "headhunters" was extinct, but my observation of the tactics of some law-enforcement officials leads me to believe that some remnant of the tribe still exist. Finally, I will indulge the question—What effect in this case would the drug, or its combination with the beer, have on defendant's ability to either fail to object to the taking of the blood sample, or his realization of a right to resist? He certainly cannot be charged, under the circumstances, with a failure to object. That there was here a clear invasion of defendant's constitutional rights, coupled with the other errors herein mentioned, cannot logically be contended. My views herein expressed find support in the following cases: *Bethel et al. v. State,* 178 Ark. 277, 10 S.W. (2d) 370; *State v. Horton,* 247 Mo. 657, 153 S.W. 1051; *State v. Matsinger,* Mo. Sup., 180 S.W. 856; *State v. Newcomb,* 220 Mo. 54, 119 S.W. 405; *People v. Corder,* 244 Mich. 274, 221 N.W. 309; *People v. Dennis,* 131 Misc. Rep. 62, 226 N. Y. S. 689; *Wragg v. Griffin,* 185 Iowa 243, 170 N.W. 400, 2 A.L.R. 1327; *People v. Akens,* 25 Cal. App. 373, 143 Pac. 795.

For the reasons herein expressed, it is my opinion defendant did not have a fair trial and should be given the opportunity to have a trial free and clear of the errors herein suggested.

Mr. Justice Moore concurs in that part of this dissenting opinion which relates to the admissibility of the blood alcohol test.

Mr. Justice Moore dissenting.

I am unable to agree with that portion of the majority opinion which approves the admission of testimony relating to a chemical analysis for alcohol content in a sample of blood withdrawn from the veins of defendant.

For reasons discussed in *Rochin v. California,* decided

by the Supreme Court of the United States on January 2, 1952, it is my opinion that the admission of this evidence was reversible error. Accordingly I respectfully dissent.