No. 19,013.

DAVID FRANCIS EARLY v. PEOPLE OF THE STATE OF COLORADO.
(352 P. [2d] 112)

Decided April 25, 1960. Rehearing denied May 31, 1960.

Mr. Earl J. Hower, for plaintiff in error.

Mr. Duke W. Dunbar, Attorney General, Mr. Frank E. Hickey, Deputy, Mr. Gerald Harrison, Assistant, for defendant in error.

Mr. Charles Ginsberg, *Amicus Curiae.*

*En Banc.*

Mr Justice Doyle delivered the opinion of the Court.

Plaintiff in error was the defendant in the trial court and will be so referred to herein. By an information

filed May 2, 1958, it was charged that on April 25, 1958, defendant killed and murdered Regina Knight. He entered pleas of not guilty and of not guilty by reason of insanity at the time of the alleged commission of the offense. The trial court ordered the trial of the issues thus formed to be consolidated and the case was tried commencing November 17, 1958. The jury found the defendant guilty of murder in the first degree and fixed the punishment at death. Thereupon, writ or error was issued.

There is no dispute as to the actual facts of the homicide. In fact, counsel for defendant conceded at the trial that if the evidence established beyond a reasonable doubt the sanity of the defendant the facts established his guilt of murder. (Counsel contended, however, that the jury should have been allowed to consider murder in the second degree.)

Defendant was released from a federal penitentiary on April 22, 1958. He immediately came to Denver and went to the office of Merrill Knight, a Denver attorney who had befriended him in the past. He made efforts to contact Knight in the latter's office and on the night of April 24, 1958, made plans to burglarize the Knight home and to rob members of the family. With this in mind he tried but was unsuccessful in his efforts to obtain a gun. Defendant said that he was convinced that he would again become involved in trouble and that this was his motivation for the robbery. He then intended to go to Texas or Mexico. He decided to rob the Knights merely because they were well off and accessible. The fact that Knight had befriended him was not significant in defendant's thinking.

On Saturday, April 25, he took a taxicab to the Knight home located in Arapahoe County on the outskirts of Denver. Finding no one at home, he entered the house through the back door, searched it and found a 32 caliber pistol with four shells and also a rifle which he loaded. He then gathered up what money he could find and

waited for the Knights to return. As individual members of the family arrived home, he bound and gagged them and waited for the others. By evening both Mr. and Mrs. Knight, their son, Kenneth, and a daughter, Karen, had been tied up and imprisoned in different rooms of the house. According to defendant's statement, his plan was to rob them and leave them bound and gagged so as to provide him time for a get-away. Although Mr. Knight was bound hand and foot, he managed to stand up and hobble around the room and refused to obey defendant when he was told to lie down. Defendant shot him three times and then went to the master bedroom and shot Mrs. Knight through the head. The pistol was then empty. Defendant then obtained the rifle, went upstairs and shot and killed Karen. Kenneth had meanwhile managed to free his feet and ran out the front door as the defendant came back downstairs apparently for the purpose of shooting and killing him. One shot was fired at Kenneth as he ran across the front yard. The rifle then jammed, permitting Kenneth to escape. Defendant collected his clothes and tried to get away in one of the Knight cars, but was captured by some of the neighbors who had been alerted by Kenneth. Although defendant harbored some resentment toward Knight, this does not appear as the motive for the killings. The murders were perpetrated coldly and dispassionately because defendant believed it necessary to the success of the robbery and in order to effect his escape.

On the issue of his insanity, the defendant called several witnesses. There were two psychologists; a psychiatrist who had examined the defendant while he had been confined in the Colorado State Hospital in 1955; another psychiatrist testified concerning the defendant's mental condition while he was confined in Leavenworth Penitentiary during the early part of 1958. Two other psychiatrists had examined defendant during the period following the homicide and prior to trial. The testimony of all of these witnesses was more or less consistent in

classifying the defendant as a schizophrenic personality with paranoid trends. The doctors conceded the ability of the defendant to recognize right from wrong, but testified that he was unable to refrain from doing wrong.

The People presented five psychiatrists, all of whom testified that the defendant was legally sane. Their testimony was to the effect that the defendant was a "sociopath" or "constitutional psychopath." All of the expert testimony detailed the past life of the defendant and included a full account of the examination which was given him. From this it would appear that although the defendant was highly intelligent, he had also shown a high degree of irresponsibility which had involved him in continuous trouble from the time he was a small boy.

These prosecution physicians were unable to find any system of delusions or other evidence indicating schizophrenia. They conceded the irresponsibility of the accused and said that he was "put together wrong" but that he was not "legally insane" in that he had the capacity to recognize right and wrong and to refrain from choosing the wrong course of action.

This question of sanity was one of fact, and since the jury found this fact in accordance with the opinions of eminent expert psychiatrists who from the record presented were entirely justified in their opinions, we are not at liberty to reach a conclusion different from that of the trier of the facts.

It is noteworthy that the trial court was scrupulous in its efforts to insure that the accused had adequate psychiatric testimony. Expert witnesses were brought in from outside the state and the court was careful to appoint other psychiatrists at the defendant's request.

Two of the People's witnesses, Drs. Hilton and Rymer, were called in by the District Attorney immediately after the commission of the crime. The major issue on this review pertains to their examination and testimony. They interviewed the defendant on April 25, 1958, in the Arapahoe County jail prior to his arraignment and

before counsel had been appointed to defend him. He had spoken freely to these physicians and from this interview they concluded that he was legally sane. Although they had identified themselves as doctors, they had not revealed that they were psychiatrists and that they were giving the defendant a psychiatriatic examination. However, at the end of the interview this fact was brought to the attention of the accused and he then stated that he had supposed that they were psychiatrists. It is also inferrible from the testimony of various witnesses that the accused was aware that Drs. Hilton and Rymer were psychiatrists because he was not lacking in such experience. He had had numerous such examinations previously and on a prior occasion had been subjected to the Rorschach psychological test.

A total of 19 errors have been assigned by the defendant. We deem it necessary to consider only those which have been argued. The points raised may be summarized as follows:

1. That it was error for the trial court to receive the testimony of Drs. Hilton and Rymer on rebuttal. This is predicated on the contention that C.R.S. '53, 39-8-1 is said to provide a mandatory and exclusive procedure for raising and trying the issue of insanity in a criminal case. Examination of the accused during confinement and before arraignment violated the statute and is contrary to the due process and equal protection guarantees of the Colorado and United States constitutions.

2. That the trial court erred in allowing Drs. Rymer and Hilton to testify concerning results of the examination which was had immediately after the arrest of the defendant. It is contended that this constituted compulsory self-incrimination in violation of the Colorado constitution.

3. That the court erred in submitting the case to the jury on the basis of C.R.S. '53, 40-2-3. It is claimed that this section, which classifies murder committed in the perpetration of arson, rape, robbery, mayhem or bur-

glary, as first degree murder, is unconstitutional in that it deprives the accused of his right to a jury trial with respect to the essential element of malice, and is thus in violation of the Fourteenth Amendment, Constitution of the United States and Article II, Section 23, Constitution of Colorado.

4. That defendant was deprived of a fair and impartial trial in that the jury reached a verdict following deliberations which required only 25 minutes. It is said that the jury thus failed and refused to read and consider the instructions of the court and that it followed its preconceived notions concerning the guilt of the defendant.

I.

*The question whether the statutory procedure is so exclusive that it prevents other examinations.*

C.R.S. '53, 39-8-1 provides:

*"Plea of insanity.* — (1)   If one of the defenses of the defendant is insanity, it must be pleaded at the same time with all other pleas, unless it is to be the sole plea of the charge. It must be pleaded orally, either by defendant or by his counsel, in the form not guilty by reason of insanity at the time of the alleged commission of the crime. A defendant who does not plead not guilty by reason of insanity shall be conclusively presumed to have been sane at the time of the commission of the offense charged, provided that the court for good cause shown may allow a change of plea at any time before the commencement of trial. A defendant who pleads not guilty by reason of insanity, without also pleading not guilty, thereby admits the commission of the offense charged."

■   This provision is mandatory to the extent that it requires a defendant who intends to defend on the ground of insanity to interpose an appropriate plea. But this does not mean that the section operates to exclude every other possible mental examination of an accused. The provision does not seek to regulate arrest and investigation. Although the practice which was here

followed could if misused be invalid, there is nothing in the statute which precludes the employment by either the accused or the People of physicians or psychiatrists with a view to their testifying at the trial.

■ C.R.S. '53, 39-8-2 provides that immediately after the entry of a plea the accused shall be committed to the Colorado State Hospital at Pueblo or the Colorado Psychopathic Hospital in Denver for observation and examination. This is intended to insure examination by psychiatrists, specialists in mental diseases, during the period of observation, but like 39-8-1 it does not operate to exclude private employment of psychiatrists.

The statute cannot be construed as exclusive from the standpoint of the People and not exclusive when applied to the accused. Hence, the result of the interpretation urged by the defendant would be to bind the accused to the results of examinations by psychiatrists at the Colorado Psychopathic Hospital in Denver or the Colorado State Hospital in Pueblo. If these physicians were to find the accused insane he would then be powerless to secure and introduce contrary testimony. This strained and rigid interpretation is not justified by either the statutory provisions or by our decisions.

■ Though mandatory to the extent indicated above, the statute does not govern all aspects of the criminal insanity question. This is apparent from our holdings in *Ingles v. People,* 92 Colo. 518, 22 P. (2d) 1109; *Battalino v. People,* 118 Colo. 587, 199 P. (2d) 897; *Berger v. People,* 122 Colo. 367, 224 P. (2d) 228; *Leick v. People,* 131 Colo. 353, 281 P. (2d) 806. These cases stand for the proposition that evidence of insanity is relevant in a criminal trial, notwithstanding that defendant has merely entered a plea of not guilty, as bearing upon the capacity of the accused to form a specific intent. The rule was strongly reiterated in *Beckstad v. People,* 133 Colo. 72, 292 P. (2d) 189 as follows:

"* * * We regret that we must say once more that which has heretofore been said over and over again for

the guidance of trial courts and prosecuting officers: A defendant in a first degree murder case has the right, without reference to a plea of insanity, to establish mental deficiency as bearing upon his capacity to form the specific intent essential to first degree murder. * * *"

Finally the principle was codified in 1955, C.R.S. 1953, 39-8-1 (Cum. Supp. 1957).

*Weihofen, Mental Disorder as a Criminal Defense,* 333, considers the question whether partisan experts could be validly excluded and whether a statute would be constitutional which creates exclusive procedures for examining the accused and for the giving of expert testimony. He points out that *Wigmore,* 3d Ed. §563 holds that such a statute interferes with the constitutional right of the parties to adduce such evidence as they think useful. He also points out one state has adopted a statute providing such exclusive provisions and that this had been held unconstitutional. See *State v. Lange,* 168 La. 958, 123 So. 639. (The statute in that case is somewhat more extreme in its provisions than excluding non-appointed expert witnesses.) Whether such a statute is valid need not be determined since our statute does not exclude other examinations or testimony based upon non-statutory examinations. The *Weihofen* and *Wigmore* discussions serve to point up the complexity of the problem and the confusion which would follow a holding that our statute excludes testimony other than that which originates pursuant to it.

Thus it cannot be said that the statute (39-8-2) here in question establishes exclusive procedures governing the mental examination of the accused. The emphasis of the statute is the establishing of procedures for pleading and trying (looking to a judgment of sane or insane) the insanity issue.

The underlying basis of defendant's objection is that examinations of the kind here conducted deprive him of a tactical advantage. He argues that if the prosecution is allowed to conduct a preliminary mental examination

the defendant is thereafter practically compelled to enter a plea of not guilty by reason of insanity. He no longer has an option to plead not guilty anticipating that he can still offer evidence of insanity for the limited purpose of negativing malice or intent and at the same time foreclosing the prosecution from a mental examination. When, as here, the prosecution secures the insanity evidence at the very outset, it is prepared for this eventuality and the accused no longer has a monopoly on this type of proof. It is said the defendant is thus deprived of a defense which has been available to him.

This contention carries to an illogical extreme the adversary or contest aspect of the insanity trial, and we are unable to agree that the defendant is deprived of a right granted by statute or guaranteed by the constitution. A pre-arraignment mental examination of the accused does not of itself violate his rights any more than the taking of a statement from him constitutes a *per se* violation. It would follow, therefore, that the single serious issue which arises is whether the particular examination violates the constitutional rights of the accused.

## II.

*The question whether the pre-arraignment mental examination constituted a violation of defendant's privilege against self-incrimination or deprives him of his life, liberty or property without due process of law.*

Defendant argues that the examination (and subsequent testimony) of Drs. Rymer and Hilton violated his constitutional rights as defined by the Fourteenth Amendment of the Constitution of the United States and Article II, Section 18 of the Colorado Constitution in that he was compelled to testify against himself. *Tuttle v. People,* 33 Colo. 243, 79 Pac. 1035; *Radinsky v. People,* 66 Colo. 179, 180 Pac. 88; *People v. Clifford,* 105 Colo. 316, 98 P. (2d) 272; *People v. McPhail,* 118 Colo. 478, 197 P. (2d) 315, and *People of the State of Colorado v. Schneider,* 133 Colo. 173, 292 P. (2d) 982. These cases recognize

that the privilege against self-incrimination operates to protect the accused against compulsory testimony not only at the trial but also in other proceedings. In the Tuttle case the accused, though suspected of the crime, was called to testify under oath at the coroner's inquest. In other cases the accused had been called to testify before grand juries. In *Block v. People,* 125 Colo. 36, 240 P. (2d) 512 the privilege was held to be inapplicable to real or demonstrative evidence. To the same effect is *Kallnbach v. People,* 125 Colo. 144, 242 P. (2d) 222.

Confessions of guilt are subject to exclusion if shown to have been involuntary and thus untrustworthy. See *Osborn v. People,* 83 Colo. 4, 262 Pac. 892; *Buschy v. People,* 73 Colo. 472, 216 Pac. 519; *Cahill v. People,* 111 Colo. 29, 137 P. (2d) 673. A showing that a confession is involuntary also renders it incompetent on the basis that it is in violation of the substantive due process requirement of the Fourteenth Amendment to the Constitution of the United States. See *Watts v. Indiana,* 338 U. S. 49; *Turner v. Pennsylvania,* 338 U. S. 62; *Harris v. South Carolina,* 338 U. S. 68, and see *Downey v. People,* 121 Colo. 307, 215 P. (2d) 892. These cases do not, however, hold that such statements violate the privilege against self-incrimination. The Supreme Court of the United States has held that the privilege against self-incrimination guaranteed by the Fifth Amendment, Constitution of the United States does not constitute a restraint on state action. *Twining v. State of New Jersey,* 211 U. S. 78. The involuntary confession is subject to the due process requirement of the Fourteenth Amendment because it is contrary to basic democratic concepts. In *Lisenba v. California,* 314 U. S. 219, 236, the reason for rule of exclusion is explained:

"* * * As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts com-

plained of must be of such quality as necessarily prevents a fair trial. Such unfairness exists when a coerced confession is used as a means of obtaining a verdict of guilt. We have so held in every instance in which we have set aside for want of due process a conviction based on a confession. * * *"

■ There is no suggestion that the defendant's responses in the case at bar were extorted from him by force, express or implied. Furthermore, there is no showing that the defendant was deceived or that he submitted to the interview-examination under the influence of material misapprehensions. Defendant has testified that he was not aware that he was receiving a mental examination when the psychiatrists interviewed him. He believed, according to his testimony, that the doctors were District Attorney agents. He does not say, however, that he would have remained mute had he been aware of their character. The doctors testified that they identified themselves as doctors. Moreover, there is basis for concluding that the defendant was aware of their identity as psychiatrists. Thus the doctrine of *Rochin v. California*, 342 U. S. 165, which condemns forcible invasion of the person of the defendant, cannot be applied here on the theory that this was a forcible or surreptitious mental invasion. We are of the opinion, therefore, that the defendant's rights were not violated and that the trial court was correct in ruling that the testimony in question was not subject to suppression and was admissible in evidence.

## III.

*Is C.R.S., '53, 40-2-3 unconstitutional in that it defines murder committed in the perpetration of a robbery as murder in the first degree?*

Defendant argues that malice is an essential ingredient of the crime of murder at common law and under our statute and that the attempt by the legislature to substitute certain named felonies for proof of this element

474

is invalid. He relies upon *Garcia v. People,* 121 Colo. 130, 213 P. (2d) 387, and *Tot v. U. S.,* 319 U. S. 463.

In the *Garcia* case a statute was declared unconstitutional which provided that in a prosecution for larceny of cattle in which ownership is alleged to be unknown it is prima facie evidence of guilt that one who has butchered a meat animal has failed to produce the hide. The Court held that no rational relation was shown to exist between the failure to produce the hide and the presumed facts which embraced all of the essential elements of the crime of larceny, including the corpus delicti. The *Tot* case, supra, involved a statute which provided that where a person had been convicted of a crime of violence and was thereafter found in possession of firearms, a presumption would exist that he had unlawfully transported the same in interstate commerce. It is readily apparent that these cases are distinguishable in that they involve use of the true presumption as a substitute for proof and dispense with the necessity for proving all the elements of the crime upon the basis of a fact which does not logically give rise to the conclusions involved in the particular offenses. In the present case, we do not have a true presumption. Here the legislature has provided a substantive definition of murder. It has declared that murder committed in the perpetration of the named felonies is murder in the first degree. The prosecution is required to prove the homicide beyond a reasonable doubt·and is also required to establish to the same degree of proof the commission of the named felony and the commission of the homicide in the perpetration of the said felony.

It was competent for ·the General Assembly to adopt this definition and the rule described in the above cases, which is also discussed in *Melville, Manual of Criminal Evidence* 44, is not applicable. See *Wigmore,* 3d Ed. §2492 (holding that this type of legislative definition does not constitute a presumption).

Our cases have uniformily upheld the provision in

question. *Andrews v. People,* 33 Colo. 193, 79 Pac. 1031; *Jones v. People,* 93 Colo. 282, 26 P. (2d) 103; *Frady v. People,* 96 Colo. 43, 40 P. (2d) 606; *Leopold v. People,* 105 Colo. 147, 95 P. (2d) 811. In *Silliman v. People,* 114 Colo. 130, 162 P. (2d) 793, the Court briefly considered the specific point which is here posed and summarily disposed of it as follows: (114 Colo. 144.)

"The court advised the jury in one of its instructions that if the defendant '* * * committed the homicide charged in the information * * * by means of poison * * * malice, deliberation, premeditation, and intent * * * need not be proved.' Defendant apparently takes the position that irrespective of the method of effecting a homicide, malice, deliberation, premeditation and intent must be proved. The most casual reading of our decisions will convince one that this contention is without legal support. Andrews v. People, 33 Colo. 193, 79 Pac. 1031; Jones v. People, 93 Colo. 282, 26 P. (2d) 103; Brady v. People, 96 Colo. 43, 40 P. (2d) 606."

In *Jones v. People,* supra, it was held that murder in the second degree is not an issue where there are no facts in the record justifying submission of instructions and a verdict defining second degree murder. The specific pertinent language of Mr. Justice Butler is as follows: (93 Colo. 288.)

"Where murder is committed by means of poison or lying in wait, or in the perpetration of, or in an attempt to perpetrate, one of the felonies specified in section 665, supra, there is only one degree of murder, namely, murder of the first degree. If the uncontradicted evidence is to the effect that murder was committed in one of the ways specified above, and in no other way, the question of second degree murder is not in the case, and the defendant should be found guilty of murder of the first degree, or he should be acquitted; there is no middle course."

See also *Battalino v. People,* 118 Colo. 587, 199 P. (2d) 897 which upheld a verdict of first degree murder and

also ruled that it was not error under circumstances very similar to those presented here to refuse to submit a verdict of second degree murder.

It follows that the statute is valid and that the court was correct in its refusal to submit murder in the second degree to the jury.

IV.

*Validity of the right and wrong and irresistible impulse tests described by C.R.S. '53, 39-8-1 (2).*

This phase of defendant's argument addresses itself to the right and wrong test. It urges that this, together with the irresistible impulse test is outmoded and that it should be repudiated in favor of the tests which are approved in *Durham v. U. S.,* 214 F. (2d) 862. We have previously considered this contention and have rejected it in *Castro v. People,* decided November 2, 1959, 140 Colo. 493, 346 P. (2d) 1020. See also *Wechsler, The Criteria of Criminal Responsibility,* 22 U. of Chicago L. Rev. 367, 374, etc.

We have carefully examined the record and find it to be remarkably free of error. The defendant was represented by highly competent counsel who defended him with skill and ability, and we cannot say that he did not receive a fair trial.

The judgment is affirmed and it is ordered that the same be executed during the week beginning June 20, 1960.

Mr. Justice Day and Mr. Justice Moore dissent.

Mr. Justice Day dissenting:

An analysis of the majority opinion reveals such statements as "the statute [under consideration] is the establishing of procedures for pleading and *trying* the insanity issue." It is precisely because the statute does govern *trials* that I object to the stamp of approval given to the *trial* in this case wherein the people placed before the jury — in one package — five psychiatrists. Three —

Drs. McDonald, Schapire and Trail — examined Early pursuant to authority in the statute which permitted them to give their testimony only by virtue thereof and limited their use of admissions and statements and other evidence as prescribed in the statute. C.R.S. '53, 39-8-2. Two psychiatrists — Drs. Hilton and Rymer — who obtained similar information under no authority that I can find in the law, gave in detail precisely the same type of testimony without benefit of the statute and without the restrictions therein.

The majority opinion skirts widely the fundamental question raised in this case: By and under what authority, either through the voluntary relationships of physician to patient or by operation of law, were these psychiatrists permitted to make such a personal examination and probe into the mind of this defendant? They could not have examined his pockets; they could not have gone to his room and searched it; they could not have violated his person. How then can they examine into his mind?

Let us see who was present at the time of the examination and by what authority. There were a Mr. McCauley, district attorney's investigator; Mr. Carleno, deputy district attorney; Mr. O'Kane, the district attorney, and the two psychiatrists. The district attorney was there as the elected representative of the People under provisions of law and his powers and duties are prescribed by law. He cannot function outside the statute. This is true of his investigators and deputies. This is true of the sheriffs; this is true of the police. Who were the doctors? Were they investigators? Police officers? Deputy district attorneys? Jail guards? Who gave them the right to question?

The three psychiatrists appointed later by the court under authority of law had the right to question because the statute says:

"It *shall be permissible* in any such observation and *examination* for said physicians to use confessions and

admissions of the defendant, and any other *evidence* as to the facts and circumstances surrounding the commission of the crime, for the purpose of *questioning* the defendant thereto *to aid them* in forming an opinion as to the sanity or insanity of the defendant; * * *" (Emphasis suppplied.)

So the same three psychiatrists called by the state gave their testimony by reason of this permission. But the other two required no such permission. I read the end result of the ruling herein to be that all of the things obtained by the psychiatrists in the post-arrest examination — the statements and admissions and the other evidence of facts and circumstances surrounding the commission of the offense — to be just as available without the aid of a statute as with it.

A further reading of the statute shows that in the same sentence, separated only by a semicolon, it is provided that when the psychiatrists conduct the examination by virtue of the statute, "* * * it shall also be permissible for them to administer or cause to be administered to the defendant sodium amythal, sodium pentothal, metrazol and like drugs, and to use or cause to be used on the defendant the polygraph, as an *aid to them* in forming an opinion as to the insanity or sanity of the defendant; * * *.)" (Emphasis supplied.)

Would the law now be that any psychiatrist making an examination before plea is permitted to use drugs, and to conduct that type examination? It will be noted that the two portions of the statute are identical — the first part that it shall be permissible in the observation and examination *to use admissions and other evidence;* in the second that it is permissible to use drugs. Now, of course, drugs were not used in this case, so the precise question is not before us, but the *statute is.* If these doctors were permitted, without aid of statutory law, to use confessions and admissions and other evidence to aid them in their opinion-testimony, then aren't they permitted to use other means as well?

A further examination of the statute used to "govern the trial" reveals:

"However, no substantive evidence acquired *directly* or *indirectly* for the first time as the result of any such *observation and examination* shall be *admissible* on the issue of guilt of the crime charged if the defendant is put to trial on that issue; and any *evidence* obtained from *such observation and examination is admissible* only on the trial of the issue of insanity, except when offered on the trial of the issue of guilt of a murder charge to rebut evidence of insanity offered by the defendant to reduce the degree of murder; and in any such case said evidence may be considered by the jury only as constituting part of the basis of the opinion of the physician as to the sanity or insanity of the defendant; and the jury shall be so instructed by the court upon the request of either party." (Emphasis supplied.)

It is to be noted that the five state psychiatrists were presented to the jury in sequence. Their testimony was virtually identical except for describing the place where the examination was held in each instance. All five testified that they used his history, his statements outlining and detailing the crime, and other information available from the defendant baring his very soul. While it is true that the testimony was monotonously repetitious and cumulative, the fact that no discernible difference appears in their testimony leads to the inescapable conclusion that two of the doctors either acted under no authority in the law or three of the doctors did not need the statute, so far as their examination of defendant was concerned. If this is true, then the statute has been rendered meaningless. Since all five testified exactly alike, could the district attorney have used only Drs. Hilton and Rymer? And if he did, or if district attorneys follow such a course in the future, could one request cautionary instructions accorded the defendant by the statute if the psychiatrists were not employed pursuant to the statute? Could evidence be obtained for the first

time through this method of examination and be used at the trial when the statute says that evidence so obtained cannot be used? These are the questions that remain unanswered, but they are questions that will haunt the courts in future cases if prosecuting attorneys decide to employ all of the state's psychiatrists — maybe four — maybe six — before arraignment, and not be concerned one whit with the examination as prescribed and restricted by the statute.

I question the accuracy of the statement in the opinion that the underlying basis of *defendant's objection* is that the examination of the kind here conducted deprived him of a "tactical advantage." That certainly is a new concept in viewing the constitutional rights of a prisoner. Every constitutional safeguard that I know of, if violated, would deprive one of a tactical advantage. As a matter of fact the constitutional safeguards are intended to give the defendant some advantage over and protection from the oppressive tactics which otherwise might be used by the strong arm of the law. As I view it, the underlying basis of defendant's objection is that he was deprived of his constitutional rights. That is what he said in his assignment of error and what he said to the trial court. And astoundingly the trial court answered his constitutional objection thusly:

"THE COURT: All right. The Court, however, will make one correction in the motion. The Court will treat this motion as under the Fourteenth Amendment rather than the Fifth, since when you make an allegation under the Fifth in a state court the Court should treat it as an allegation under the Fourteenth. * * * This constitutes reversible error in my opinion. I am of the frank opinion that there is much to be said for the defendant's position in this case and I want the record to clearly reflect that, although I will put in writing my opinion at a later time. * * * It is, as I say again, repugnant to me for a person's mind to be explored — as much as for his stomach to be explored, as pointed out in one United States Supreme

Court case — prior to the time of arraignment and plea, especially where the intent of the exploration is to foreclose what may appear to be a legitimate defense — which it may or may not depending upon the facts and circumstances.

"I am of the opinion that due process demands that the People's Attorney in cases of this kind follow very closely the strict letter of the statute and that the examination to be held only by order of Court in state hospitals. However, I am frank to admit that I find nothing in the law to support such a conclusion, that the cases which I have found have dealt with collateral and relative matters and do not bear specifically on this question of examining into the mind of a defendant at this particular time. I also wish to point out for the record that this is not a casual examination such as a lay witness might have made. This is not an examination of someone who was heretofore familiar with the defendant's particular conduct, his behavior patterns, which might be the basis for an opinion as to his sanity. The Court is of the opinion that this particular examination by Dr. Rymer and Dr. Hilton was a direct attempt to gain for the first time some understanding and insight into the question of the defendant's sanity prior to the time that he entered such a plea.

"I am frank to say, and I say this just simply as a personal expression, that if I were sitting as an appellate judge reviewing such a matter I would not hesitate to declare same a basic infringement of constitutional rights. * * *."

The trial court put his finger on the crux of this constitutional question when he said "this particular examination by Dr. Rymer and Dr. Hilton was a direct attempt to gain *for the first time some understanding and insight into the question of the defendant's sanity * * *.*" I would add that inquiry into this area is not open to the state until the question is raised by the defendant. Put another way, the district attorney and the police officers,

pursuant to their lawful authority, may examine a defendant in the course of an investigation to determine whether a crime has been committed against the people of the State of Colorado. In pursuit of that objective they do have all of the authority which we associate with the police powers. The doctors here were on no such inquiry, had no such authority, and could not proceed as agents of the state possessing the powers of law enforcement officers.

The query, by what authority did these doctors ask the defendant a single question or extract from him an answer, is brushed aside by the statement that the defendant had had psychiatric examinations before while in prison, and that he didn't object or stand mute, or that he was not being forced or compelled to answer. How about one in the toils of the law for the first time? There is grave doubt that he was told who the examining physicians were, and he *certainly was not told* the purpose of their presence, how the statements would be used, either for or against him. He was not told that he need not answer, and he was not told anything which even a "rookie" police officer knows is preliminary to any examination conducted by police authorities. Here is what the doctors said occurred at the examination:

Testimony of Dr. Hilton:

"Q. Then you started in with questioning, is that right? A. That's right. Q. And nobody explained the purpose of your visit there then, did they, if that was the sum and substance of the conversation? A. That we wanted to *question him about what had happened.* Q. Yes, but that was the sum and substance of what you told him you were there for, or McCauley told him you were there for? A. That's right." (Emphasis supplied.)

Testimony of Dr. Rymer:

"Q. And you say that you introduced yourselves or McCauley introduced you, by name? And you say you told him the purpose that you were there for? A. To talk to him, yes, sir. Q. Well, I want to know just what you

said. What did you tell him you came there for? A. Told him we wanted to talk to him. Q. That is what you told him? A. Yes. Q. You told him you wanted to examine him? Did you tell him the purpose of that examination? Did you tell him you wanted to examine him to see if he was sane or insane? Did you tell him that? A. Not in those words. Q. And neither did Dr. Hilton, did he, in your presence? A. Dr. Hilton will be here to testify * * *. Q. In your presence? A. As far as I know, *no*. Q. And you confined your examination mostly to what occurred the night before, or the afternoon previous, didn't you? A. No, we covered an *awful lot of territory*." (Emphasis supplied.)

The defendant's testimony is:

"Then they carried me on back, walked me on back, to the back room and we went in there and talked *mainly about the killings, that happened the night before.* *For an hour or an hour and a half they went over that and then Barney came in and started questioning me some more about the killing,* and then just as the thing was breaking up, the talk, why one of these gentlemen ask me to draw them a couple of pictures * * *." (Emphasis supplied.)

To put it bluntly, these two doctors were there with no restrictions as to the privilege between patient and physician; they were not bound by the rules that govern constitutional and statutory officers, or as would appear by the ethical standards of their profession.

Another statement in the majority opinion challenges attention, namely, that because there is no expressed prohibition against employment of psychiatrists by the state, the statute, therefore, does not operate to exclude the private employment of psychiatrists. How does the state, that may not buy a pencil without authority in the law, have the right to employ a psychiatrist to *examine the defendant* without such authority? In the prosecution of criminal offenses, the power of the state must be exercised within the circumscribed limits pre-

scribed by constitutional procedures. It is my under-standing that the reason for the statute under considera-tion was to give the state authority it did not previously possess in circumstances where a person has waived certain of his constitutional rights in raising the issue of his sanity at the trial. A statute permits the examina-tion of a plaintiff by a physician in a civil damage action when the person himself puts the issue of his health and of the extent of his injuries before the court. If the state can now, or always could, employ psychiatrists privately, then why the statute? And why the limitations and safeguards set up in the statute in connection with the information extracted from a defendant? I believe the common understanding of the law is that once the legis-lature has spoken on the question by enacting a statute in the field it becomes the authority. Otherwise why set up standards and procedures on the one hand and on the other hand hold by judicial pronouncement that they *may* be followed, but that other, different standards also may be followed if it suits the purpose at hand?

We have, it seems to me, a doctrine announced in this case whereby the state has some kind of inherent or undefined power by virtue of its sovereignty to do an act or adopt a procedure; that although there is a law on the subject permitting the act or conduct and pre-scribing the manner of its exercise, the state can employ the method prescribed, or adopt another, or both, and offer in evidence the entire result — obtained under both procedures — without distinction. Extending such doc-trine to the area of property rights, one could argue that although the constitution prohibits the taking of prop-erty for public use without compensation, and although there are statutes on eminent domain laying the ground rules under which rights to condemn property may be exercised, such laws do not operate to exclude the acquisi-tion of property by other means so long as the right to compensation is not violated.