No. 20511.

GORDON W. BENNETT *v.* THE PEOPLE OF THE
STATE OF COLORADO.
(392 P.2d 657)

Decided June 8, 1964.

Messrs. GORSUCH, KIRGIS, CAMPBELL, WALKER & GROVER, Mr. DWIGHT D. MURPHEY, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. JOHN E. BUSH, Assistant, for defendant in error.

*In Department.*

Opinion by MR. CHIEF JUSTICE McWILLIAMS.

IN a violent collision between an automobile and a truck in the intersection of West Mississippi Avenue and South Santa Fe Drive in Denver, one Tinsley driving a truck owned by the plaintiff in error, Bennett, caused the death of Dr. Sayer.

This particular intersection is controlled by signal lights and just prior to the impact Dr. Sayer was proceeding in a westerly direction on West Mississippi Avenue approaching Santa Fe Drive. At the moment

of impact Dr. Sayer was in the intersection proper and on a green or go light.

Immediately prior to the accident Tinsley was proceeding in a southerly direction on South Santa Fe Drive approaching West Mississippi Avenue and at the moment of impact he, too, was in the intersection proper, but on the red or stop light.

In explaining why he admittedly "ran" the red light, Tinsley stated that as he approached this intersection at a speed of from 25 to 35 miles per hour, the speed limit of South Santa Fe being 45 miles per hour, he specifically noticed that his signal light was red or stop, but that when he tried to stop his truck he could not do so, because of a complete brake failure.

As was mentioned above, the truck driven by Tinsley was owned by his employer, Bennett, and Tinsley at the time had completed his day's work and was enroute to his employer's parking area near Fort Logan. He was alone in the truck when the accident occurred.

By direct information Tinsley and Bennett were jointly charged with the crime of involuntary manslaughter. C.R.S. '53, 40-2-7. Upon arraignment each pled not guilty and, Bennett's motion for a separate trial having been denied, a joint trial by jury ensued. As to Tinsley the jury returned a verdict of "not guilty," but the same jury at the same time found Bennett guilty of involuntary manslaughter.

In due time Bennett's motion for entry of a judgment of acquittal notwithstanding the verdict or for a new trial was denied. Bennett was thereupon sentenced to a six month term in the common jail, which sentence the trial court then promptly suspended because Bennett had already "suffered a great deal" and the "case is one of first impression in Colorado." By the present writ of error Bennett seeks reversal of this judgment and suspended sentence.

The dominant issue posed by this writ of error pertains to the sufficiency of the evidence. At the con-

clusion of the People's evidence Bennett under Rule 29, Colo. R. Crim. P., moved for a judgment of acquittal on the ground that the evidence was insufficient to sustain the charge of involuntary manslaughter. The trial court declined to rule on this motion, reserving its decision "until the conclusion of all the evidence." The practice, if such it be — and we suspect it is, of reserving a ruling on a motion for a judgment of acquittal interposed by a defendant in a criminal proceeding at the close of the People's presentation of evidence is not authorized by the Colo. R. Crim. P. and is hereby disapproved. See *Jackson v. United States,* 250 F.2d 897.

■■ At the conclusion of all the evidence Bennett renewed his motion for acquittal, which motion was then denied by the trial court. Thereafter Bennett in his motion for judgment of acquittal notwithstanding the verdict of the jury or for a new trial again challenged the sufficiency of the evidence and in our view such is the only issue which need be considered. This being the case, a brief recital of the facts is deemed helpful to an understanding of the reasoning which forms the basis for our firm conclusion that the evidence is legally *in*sufficient to sustain the jury's verdict that Bennett is guilty of involuntary manslaughter.

Before proceeding to an analysis of the evidence, it is perhaps helpful to consider the amount of evidence necessary to sustain a conviction of involuntary manslaughter. In *Trujillo v. People,* 133 Colo. 186, 292 P. 2d 980, where this Court reversed a conviction of a bus driver on a charge of involuntary manslaughter, it was stated:

"It is clear that before defendant could be convicted of manslaughter, there must have been evidence tending to prove he recklessly and wantonly failed to exercise the care and caution that a reasonably prudent person would have exercised under similar circumstances, and that his conduct was such as to indicate a

reckless and wanton disregard for the safety of others. Ordinary or simple negligence is not sufficient to sustain a charge of involuntary manslaughter. We see no difference in the degree of negligence required to sustain a charge of manslaughter and that necessary to support a verdict in favor of a claimant in an action for damages under the guest statute. In each instance the essential ingredient is a wanton and wilful disregard of the rights and safety of others."

In the instant case, then, is there evidence to support the determination by the jury that Bennett was guilty of negligence consisting of a reckless and wanton disregard of the rights and safety of others, which negligence caused and resulted in the tragic death of Dr. Sayer? Our examination of the record convinces us that the evidence in this regard is wholly lacking and is therefore insufficient to sustain the verdict. What does the record disclose as to possible criminal neglect on the part of Bennett?

Bennett was engaged in the business of hauling water which was used in and around construction sites, and in conducting this business Bennett owned several trucks, including the one driven by Tinsley at the time of the collision with Dr. Sayer's vehicle. This particular truck was a 1947 G.M.C. truck and had an air brake system which if properly operating maintained a pressure of from 90-110 pounds. It was established that Bennett on the day preceding the accident had himself driven this particular truck and on this occasion had noted that when the truck was stopped and idling this pressure dropped to 60 pounds. This dropping in pressure was due to a "slow leak in the truck's quick release valve" and Bennett went on to relate that when the truck was moving, the air pressure went back up to normal because of the increased action of the motor driven compressor. There was no evidence that Bennett had experienced even a partial brake failure, let alone

a complete brake failure, when using the truck on this occasion.

On the day of the accident Tinsley drove from the parking area near Fort Logan to a construction site some 10 miles away. Bennett happened to be on this particular job when Tinsley arrived and he and Tinsley at this time and place had conversation concerning the fact that the air brake pressure dropped when the truck was idling. Bennett reportedly informed Tinsley that he was fully aware of this dropping in air pressure, but that he (Tinsley) should nevertheless go ahead and drive the truck until there was an opportunity to get this leak in the quick release valve repaired, as there was actually "nothing to worry about." Accordingly, Tinsley thereupon continued to use the truck during the balance of the work day.

About 4 P.M. Tinsley drove an additional 4 miles to another job site. At 5 P.M. Tinsley's work day was concluded and he proceeded to drive the truck to the parking area near Fort Logan. He had driven some 7 miles before reaching the scene of this tragedy. Tinsley testified that during the course of his day's work he had occasion to stop the truck some 600 times and that at no time did he have any problem in stopping.

Recapitulating briefly, there is nothing in the entire record to even suggest that Bennett had any knowledge that the brakes on his truck when applied were not doing that which they were intended to do, i.e. stop the truck. True, Bennett was aware that the air brake pressure dropped when the truck was stopped and idling. He was not only made aware of this fact by Tinsley, but had personal experience in connection therewith on the preceding day. But knowledge that the air brake pressure dropped when the truck was stopped and idling is not tantamount to knowledge that the brakes when applied would not stop the truck.

Continuing in this same vein, there is no evidence that this drop in air brake pressure was in anywise connected

with the sudden and complete brake failure experienced by Tinsley when he applied the brakes as he approached the red light at the intersection of South Santa Fe and West Mississippi. In this regard the People's expert witness testified that based on his examination of the truck the day after the accident the "cause of the brake failure was the breakage of a brake air line copper tube" which led to the right tandem brake chamber. This witness further testified that tube was not broken in the impact and that this "line could break any time without warning."

The foregoing recital is believed to be a fair synopsis of the evidence received at trial. Is it sufficient to sustain the verdict of the jury that Bennett was guilty of the *crime* of involuntary manslaughter? We hold that it is not, but before stating our reasons therefor, it is deemed important to delineate the role to be played by this Court in passing upon the sufficiency of the evidence in a criminal proceeding.

It is not for us to weigh the evidence or to determine the credibility of the witnesses and the verdict of the jury must be sustained "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680. See, also, *United States v. McNeil,* 255 F. 2d 387, and *Riggs v. United States,* 280 F.2d 949.

Similarly, in *Small v. United States,* 255 F. 2d 603, it was stated:

"The defendant moved for acquittal at the close of the government's case and also at the end of the trial, and the issue before us is whether the evidence viewed in the light most favorable to the government was sufficient to support the verdict of guilty."

Finally, in *United States v. Sigal,* 216 F. Supp. 306, appears the following:

"Since the jury has brought in verdicts of guilty, the evidence is to be viewed together with all the inferences

reasonably and logically deducible therefrom in the light most favorable to the government."

In support of the proposition that this Court is in accord with the foregoing, see *St. Louis v. People,* 120 Colo. 345, 209 P.2d 538, and *Kallnbach v. People,* 125 Colo. 144, 242 P.2d 222.

In our considered view the evidence adduced by the People when viewed in a light most favorable to the People is still insufficient to sustain the conviction of the crime of involuntary manslaughter and the trial court should have granted Bennett's motion to dismiss interposed when the People rested their case. No evidentiary matter having been brought forward by Bennett which in anywise supplied the defect in the People's case, Bennett's evidence actually tending to accentuate and emphasize the fatal gap therein, Bennett's motion to dismiss interposed at the conclusion of all the evidence should have been granted. The evidence is simply insufficient to support the eventual finding of the jury that Bennett was guilty of the crime of involuntary manslaughter.

In *Stevenson v. People,* 148 Colo. 538, 367 P.2d 339, in holding the evidence was insufficient to support a burglary conviction, it was said:

"Viewed in its entirety the evidence relied on by the People is insufficient both in quality and quantity to support the verdict of the jury. It is unconvincing, leaves too much to speculation and conjecture, and is equally consistent with . . . [a reasonable] hypothesis of innocence as with that of guilt. True, one possessed of only normal curiosity might be suspicious and surmise that Stevenson had something to do with the Home-dew burglary, but mere suspicions, however strong, have not yet been accepted in lieu of proof beyond a reasonable doubt."

Similar observations were made by the Supreme Court of Illinois in *People v. Lynn,* 385 Ill. 165, 52 N.E. 2d 166, where that court in reversing an involuntary man-

slaughter conviction based in part on a mechanical failure of a motor vehicle, declared as follows:

"Moreover, liability arising out of mechanical failure of motor vehicles and appurtenances is not necessarily conclusive of negligence, criminal or otherwise, where the failure occurred under circumstances beyond one's control . . . Where acts or circumstances are attributable to either an innocent or a criminal cause, the innocent hypothesis will be adopted."

Summarizing then, the precise cause of the sudden and complete brake failure was perhaps not established with certainty. The People's expert, however, was of the definite opinion that the cause of the brake failure was the sudden "breakage of a brake air line copper tube." This opinion incidentally was buttressed considerably by the evidence adduced by Bennett. There was absolutely no evidence that the leak in the truck's quick release valve causing a drop in pressure when the truck was idling had any connection whatsoever with the brake failure. Bennett's only knowledge as to so-called "defective" brakes pertained to this leak in the quick release valve, and there is nothing in the record to indicate that if a mechanic had been employed to repair the leak in the quick release valve he in the process of remedying that particular defect would have discovered the latent defect which later did cause the complete brake failure of the truck at South Santa Fe Drive and West Mississippi Avenue.

The judgment is therefore reversed and the cause remanded with directions to the trial court to dismiss the charge of involuntary manslaughter and discharge Bennett.

MR. JUSTICE DAY and MR. JUSTICE PRINGLE concur.